**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF KENTUCKY**
**SOUTHERN DIVISION AT PIKEVILLE**

**KENTUCKY RIVERKEEPER, INC., <u>et al.</u>,**

        **Plaintiffs,**

    **v.**                              **CIVIL ACTION NO. 05-181-DLB**

**COLONEL KEITH E. LANDRY, <u>et al</u>.**

        **Defendants.**

**PLAINTIFFS' MEMORANDUM IN SUPPORT OF THEIR RENEWED**
**MOTION FOR SUMMARY JUDGMENT AND INJUNCTIVE RELIEF**
**ON THEIR SUPPLEMENTAL COMPLAINT**

STEPHEN A. SANDERS
Appalachian Citizens Law Center
317 Main Street
Whitesburg, KY 41858
(606) 633-3929

JOSEPH M. LOVETT
Appalachian Center for the Economy and the
   Environment
P.O. Box 507
Lewisburg, WV 24901
(304) 645-9006

JAMES M. HECKER
Public Justice
1825 K Street, N.W., Suite 200
Washington, D.C. 20006
(202) 797-8600

Counsel for Plaintiffs

# Table of Contents

Introduction. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

I. The Corps' Decisions to Issue NWPs 21, 49 and 50 Violate the CWA, NEPA and the
APA and Are Arbitrary and Capricious. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

    A. The Corps' Cumulative Impact Analysis for NWPs 21, 49 and 50 Illegally
Excluded the Effects of Past NWP Authorizations. . . . . . . . . . . . . . . . . . . . . 5

    B. The Corps' Cumulative Impact Analysis for NWPs 21, 49 and 50 Was
Conclusory and Relied on Unsupported Claims that Compensatory Mitigation
Is Effective. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

II. Plaintiffs Still Have Standing to Sue. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

III. The Court Should Issue an Order Vacating and Remanding NWPs 21, 49 and 50
and Prohibiting the Corps from Issuing Any Further NWP 21, 49 or 50 Authorizations
in This District . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

Conclusion. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

List of Exhibits. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

**Introduction**

Plaintiffs filed this action in January 2005, contending that the U.S. Army Corps of Engineers' decisions to issue its 2002 NWPs 21, 49 and 50 were made in violation of its statutory duties under the Clean Water Act (CWA), 33 U.S.C. § 1344, National Environmental Policy Act, 42 U.S.C. §§ 4321 <u>et seq</u>. (NEPA), and Administrative Procedure Act (APA), 5 U.S.C. §§ 553, 706(2)(A).  Plaintiffs first moved for summary judgment in March 2005 on the 2002 NWP 21 and the Court heard oral argument on that motion in November 2005.  Doc. #13.  In March 2007 the Court decided that Plaintiffs' motion became moot when the 2002 NWP 21 expired.  Doc. #103. The Court declined to reconsider that decision in March 2008, but allowed Plaintiffs to supplement their Complaint to challenge the reissued 2007 NWPs 21, 49, and 50.  Doc. #127.

Plaintiffs moved for summary judgment a second time on the 2007 NWPs in July 2008 and the Court heard oral argument on that motion in December 2008.  Doc. #141.  After the Corps proposed in July 2009 to suspend NWP 21, the Court stayed the case and denied Plaintiffs' motion without prejudice.  Doc. #164.  After the Corps finalized that suspension in June 2010, the Court in January 2011 granted Plaintiffs' motion to lift the stay and allowed Plaintiffs to renew their summary judgment motion.  Doc. #173.  Plaintiffs are therefore renewing their motion for summary judgment and briefing the merits for a third time.

Since the second oral argument in December 2008, there have been two major developments which are causing Plaintiffs to narrow the focus of their summary judgment motion in this case to two issues: cumulative impacts and compensatory mitigation.  Plaintiffs are withdrawing their claims that are unrelated to these two issues.  Plaintiffs are not conceding that those claims lack merit and are withdrawing them only to simplify, and hopefully expedite, the resolution of this long-pending case.

The first development was in March 2009, when the U.S. District Court for the Southern District of West Virginia vacated the 2007 NWP 21 and enjoined its further use in that District. OVEC v. Hurst, 604 F. Supp.2d 860 (S.D. W.Va. 2009). Judge Goodwin held that:

> the Corps' cumulative impacts analysis with respect to NWP 21 (2007) was inadequate for two reasons. First, the Corps failed to consider the continuing impacts of past actions, which is a relevant factor for a cumulative impacts analysis. Second, the Corps failed to explain and provide a rational explanation for its conclusion that 'compensatory mitigation will attenuate cumulative impacts.'

Id. at 884-901. In August 2010, the Corps voluntarily dismissed its appeal of that decision. Doc. #35-37, No. 09-1660 (4th Cir.). In January 2011, the remaining coal industry intervenors voluntarily dismissed their appeal. Doc. #50-52, No. 09-1635 (4th Cir.). Thus, that decision is now final and unappealable. Plaintiffs urge this Court to adopt the persuasive reasoning in Judge Goodwin's decision, which we discuss more fully below.

The second development was in June 2010, when the Corps suspended the use of NWP 21 in Appalachia, including the counties where the Corps had previously issued NWP 21 authorizations in this District. 75 Fed. Reg. 34711, 34713 (June 18, 2010). When it proposed that suspension, the Corps admitted that NWP 21 "has been used to authorize surface coal mining activities that involve discharges of dredged or fill material into waters of the United States that have resulted in adverse environmental impacts that may be more than minimal on a cumulative basis." 74 Fed. Reg. 34311, 34313 (July 15, 2009). The Corps also acknowledged that "it would be more appropriate to evaluate these adverse effects through the individual permit process, with a full public interest review, rather than through NWP 21." Id. In its final decision, the Corps reiterated its "concerns that continued use of this permit in the Appalachian region . . . may result in more than minimal individual and cumulative adverse effects to aquatic resources." 75 Fed.

Reg. at 34713.

Based on these admissions, the Corps could not logically have made the required determination under § 404(e) of the CWA at the time NWP 21 was reissued in 2007 that NWP 21 has had, or will have, minimal environmental effects, both individually and cumulatively. If past discharges under NWP 21 "have resulted in adverse environmental effects that may be more than minimal on a cumulative basis" (74 Fed. Reg. at 34313), and "continued use of this permit" may also "result in more than minimal . . . cumulative adverse effects" (75 Fed. Reg. at 34713), then neither past nor continued use of NWP 21 satisfies the requirement under § 404(e) of the CWA that an NWP must have no more than minimal effects.

When it made its suspension decision on June 18, 2010, however, the Corps did not carry out the full effect of its own admissions and vacate NWP 21 in its entirety. Instead, the Corps grandfathered past NWP 21 authorizations issued prior to June 18, 2010 and allowed the holders of those authorizations to continue their stream-filling operations until March 2013. The Corps only refrained from issuing new NWP 21 authorizations after June 18, 2010.

It is internally contradictory for the Corps to suspend new NWP 21 authorizations on the ground that they cause more than minimal cumulative effects, but then to allow old NWP 21 authorizations to continue even though they contribute to those same cumulative effects. The Corps cannot authorize <u>any</u> use of NWP 21 without demonstrating that the cumulative impacts of <u>all</u> NWP 21 authorizations, both past and future, are cumulatively minimal. The Corps cannot rationally make such a finding because its suspension rests on its admission that these cumulative impacts may be more than minimal. Consequently, the unassailable consequence of the Corps' own admissions is that NWP 21 is invalid and the Corps cannot use it to authorize any mining

operations in this District.

Based on Judge Goodwin's ruling and the Corps' admissions, the Corps should have vacated NWP 21 throughout Appalachia. Instead, there is a conflict between the law in the Southern District of West Virginia, where NWP 21 has been vacated by court order, and the law in the Eastern District of Kentucky, where NWP 21 has only been suspended by the Corps. This Court should rectify that conflict by vacating NWP 21 in this District as well.

Furthermore, as we show below, the defects underlying NWP 21 also apply to NWPs 49 and 50. In all three instances, the Corps applied and relied on the same conclusory cumulative impact analysis and the same unsupported reliance on compensatory mitigation. Thus, the Court should vacate those NWPs as well.

## I. The Corps' Decisions to Issue NWPs 21, 49 and 50 Violate the CWA, NEPA and the APA and Are Arbitrary and Capricious

The Corps' cumulative impact analysis for NWP 21 consists, in its entirety, of the following perfunctory analysis:

> Using the current trend, approximately 1,085 activities could be authorized over a five year period until this NWP expires, resulting in impacts to approximately 320 acres of waters of the United States, including jurisdictional wetlands. Approximately 540 acres of compensatory mitigation would be required to offset those impacts. The required compensatory mitigation will attenuate cumulative impacts on the Nation's aquatic resources, so that the net effects on the aquatic environment resulting from the activities authorized by this NWP will be minimal.

NWP 21 DD, p. 22, Pl. Ex. 1. The cumulative impact analyses for NWPs 49 and 50 are identical except for different acreage numbers. For NWP 49:

> Using the current trend, approximately 585 activities could be authorized over a five year period until this NWP expires, resulting in impacts to approximately 1,890 acres of waters of the United States, including jurisdictional wetlands. Approximately 1,470 acres of compensatory mitigation would be required to offset those impacts. The required

compensatory mitigation will attenuate cumulative impacts on the Nation's aquatic resources, so that the net effects on the aquatic environment resulting from the activities authorized by this NWP will be minimal.

NWP 49 DD, p. 21, Pl. Ex. 2.  For NWP 50:

Using the current trend, approximately 430 activities could be authorized over a five year period until this NWP expires, resulting in impacts to approximately 150 acres of waters of the United States, including jurisdictional wetlands. Approximately 195 acres of compensatory mitigation would be required to offset those impacts. The required compensatory mitigation will attenuate cumulative impacts on the Nation's aquatic resources, so that the net effects on the aquatic environment resulting from the activities authorized by this NWP will be minimal.

NWP 50 DD, p. 18, Pl. Ex. 3.  As the OVEC court found, these three conclusory sentences are arbitrary and capricious for two reasons.

A.    The Corps' Cumulative Impact Analysis for NWPs 21, 49 and 50 Illegally Excluded the Effects of Past NWP Authorizations

The Corps did not conduct a valid cumulative impact analysis, because it only looked at the effects of newly authorized NWP activities during the five years from 2007-2012.  It excluded the present effects during that same five-year period of all prior NWP authorizations.  The Corps stated:

The cumulative effects analysis is more properly focused on the permits that can be used to authorize regulated activities, not past permits that have expired.  Therefore, the cumulative effects analysis for the NWP issuance needs to focus on the reasonably foreseeable cumulative effects that are expected to occur during the five year period the NWPs are valid.

72 Fed. Reg. at 11096.  The OVEC court correctly held that the Corps' exclusion of the cumulative effects of past permits violated NEPA.  604 F. Supp. 2d at 885-87.

The Corps has an obligation under both the CWA and NEPA to consider the full cumulative impacts of its actions.  The CWA prohibits the issuance of an NWP unless the Corps

determines that its effects are cumulatively minimal.  33 U.S.C. 1344(e).  The 404(b)(1)

Guidelines define cumulative effects as "the changes in an aquatic ecosystem that are attributable

to the collective effect of a number of individual discharges of dredged or fill material."  40 C.F.R.

§ 230.11(g)(1).  The Guidelines require these cumulative impacts to be "documented and

considered during the decision-making process concerning . . . the issuance of a General permit."

Id., § 230.11(g)(2).

Similarly, NEPA requires the Corps to prepare an EIS on major federal actions that have a

"significant" environmental impact, and significant impacts include cumulative impacts "which

result[] from the incremental impact of the action when added to other past, present, and

reasonably foreseeable future actions ...."  42 U.S.C. § 4332(2)(C); 40 C.F.R. §§ 1508.27(b)(7),

1508.7.  According to a guidance document issued by the Council on Environmental Quality

(CEQ), "review of past actions is required to the extent that this review informs agency

decisionmaking regarding the proposed action."  604 F. Supp.2d at 885.  NEPA therefore

requires adequate cataloguing of relevant past projects in the area.  Muckleshoot Indian Tribe v.

United States Forest Serv., 177 F.3d 800, 809-10 (9th Cir.1999); O'Reilly v. U.S. Army Corps of

Engineers, 477 F.3d 225, 234-35 (5th Cir. 2007).

It is undisputed that the Corps did not consider the present cumulative effects of the past

use of NWPs when it issued the 2007 NWPs.  In the OVEC case, the Corps defended its failure to

consider these effects on the grounds that NWPs "do not authorize activities of a continuing

nature" and only last for five years.  72 Fed. Reg. at 11096; 604 F. Supp.2d at 885.  As the

OVEC court found, this argument is irrational because "[w]hether a project is complete has no

bearing on whether that project results in present effects to the environment."  Id. at 886.  The

OVEC court also found that NWP 21 activities have contributed to the loss of thousands of miles of streams in Appalachia over the past twenty years.  Id. at 886-87.  The OVEC court therefore concluded that the Corps' failure to conduct any inquiry into the existence of the present effect of past actions violated its duty to consider all relevant cumulative effects.  Id.

The Corps' failure to consider these effects during its NWP 21 decision-making process is also irrational because the Corps took the opposite position and considered past effects when it prepared its October 2005 programmatic EIS on surface coal mining in Appalachia.  In that EIS, the Corps' cumulative impact analysis was "based on ten years, 1992-2002 of permit footprints" and also projected future stream losses through 2013.  PEIS, p. IV.B.1, Pl. Ex. 4.  Thus, contrary to the Corps' cumulative analysis for the NWPs, which was limited to only five years, the Corps' cumulative analysis in the programmatic EIS correctly recognized that stream loss is a continuing and additive process that should be measured over at least twenty years.  In the real world, a valley fill authorized by an NWP buries a stream permanently and therefore has the "continuing" effect of eliminating that stream as an aquatic resource forever. As Judge Goodwin stated, these permanent, irreversible losses "are not corrected or cured every five years with the renewal of a new nationwide permit."  604 F. Supp.2d at 887.

Furthermore, after the OVEC court issued its decision in March 2009, the Corps admitted that these cumulative effects of past NWP 21 activities may be significant.  When it proposed to suspend NWP 21 in July 2009, the Corps admitted that NWP 21 "has been used to authorize surface coal mining activities that involve discharges of dredged or fill material into waters of the United States that have resulted in adverse environmental impacts that may be more than minimal on a cumulative basis." 74 Fed. Reg. at 34313 (emphasis added).  In other words, the Corps

admits that the effects of past NWP 21 activities are not zero. If they are not zero, they cannot be summarily excluded from a cumulative impact analysis. But the Corps did exclude them, and its cumulative impact analysis for NWPs 21, 49 and 50 therefore violated the CWA and NEPA.

**B.    The Corps' Cumulative Impact Analysis for NWPs 21, 49 and 50 Was Conclusory and Relied on Unsupported Claims that Compensatory Mitigation Is Effective**

The Corps' cumulative impact analysis was merely a conclusory balance sheet showing how many times NWPs 21, 49 and 50 are expected to be used, how many acres of waters are affected, and how many acres of mitigation are required. See pp. 4-5 above. For each of these NWPs the Corps concludes, without any supporting explanation or documentation, that "[t]he required compensatory mitigation will attenuate cumulative impacts on the Nation's aquatic resources, so that the net effects on the aquatic environment resulting from the activities authorized by this NWP will be minimal." Id. (emphasis added); see also 72 Fed. Reg. at 11100 (compensatory mitigation plans are an "important mechanism" to achieve minimal impacts). The Corps also relied for its minimal effects determination on the ability of division and district engineers to "conduct more detailed assessments" later. Id.

As Judge Goodwin found in OVEC, the Corps "implicitly conceded that the permit would cause significant cumulative environmental impacts," and then "relied exclusively on the presumed success of compensatory mitigation and later regional determinations in deciding that [the] cumulative impacts would be minimal." 604 F. Supp.2d at 887. Judge Goodwin held that "the Corps' cumulative impacts determination was conclusory because it relied on an unsupported belief in the success of mitigation measures." Id. "The 'mere listing' of mitigation measures and processes, without any analysis, cannot support a cumulative impacts determination." Id.

This lack of analysis or documentation violates the CWA, NEPA and the APA. The CWA provides that an NWP must be based on the 404(b)(1) Guidelines. 33 U.S.C. § 1344(e)(1)(A). Those Guidelines require the Corps to "set forth in writing an evaluation of the potential individual and cumulative adverse impacts of the category of activities to be regulated under the General Permit." 40 C.F.R. § 230.7(b). Such evaluations must "include documented information supporting each factual determination in § 230.11 of the Guidelines." Id., § 230.7(b)(1). The Corps' cumulative impact sections for NWPs 21, 49 and 50 fail this test under the CWA because they contain no information to demonstrate and explain why mitigation or later regional determinations will reduce cumulative impacts to a minimal level. "The failure of an agency to comply with its own regulations constitutes arbitrary and capricious conduct." Simmons v. Block, 782 F.2d 1545, 1550 (11th Cir. 1986).

Similarly, under NEPA and the APA, the Corps must do more than simply make a determination that cumulative impacts are insignificant. It must support that determination with substantial evidence. 5 U.S.C. § 706(2)(E). It must also explain the basis for its decision in a manner that is rational and sufficiently detailed, and must link the evidence to the conclusions drawn from it. Transactive Corp. v. U.S., 91 F.3d 232, 236 (D.C. Cir. 1996); Railroad Ventures, Inc. v. Surface Transp. Bd., 299 F.3d 523, 558 (6th Cir. 2002); Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 52 (1983) (holding that an "agency must explain the evidence which is available, and must offer a rational connection between the facts, found and the choice made").

In its response to comments criticizing the Corps' unsupported reliance on compensatory mitigation, the Corps "relied on a review *process* that would identify necessary and appropriate

mitigation measures at a later time and on a case-by-case basis." OVEC, 604 F. Supp.2d at 889

(emphasis in original). The Corps' reliance on that same process is clearly apparent in the

decision-making record for all three NWPs. See 72 Fed. Reg. at 11116 (NWP 21) ("We believe

our process for NWP 21 ensures that activities authorized by the NWP result in no more than

minimal adverse impacts . . ."); id. at 11150 (NWP 49) ("We believe the pre-construction

notification requirements for this NWP ensure that authorized activities result in no more than

minimal adverse impacts . . ."); id. at 11152 (NWP 50) ("We believe our process for this NWP

ensures that activities authorized by the NWP result in no more than minimal adverse impacts . .

."). The OVEC court held that the Corps' reliance on this process was arbitrary and capricious

because it "has not provided any evidence that its proposed mitigation process would be

successful" or "adequately policed" through monitoring programs. 604 F. Supp.2d at 891. The

Corps "failed to provide any explanation for *why* it believes mitigation imposed through the case-

by-case review of NWP 21 (2007) activities will work to mitigate the permit's cumulative impacts

to a minimal level." Id. at 892.

     The OVEC court also extensively reviewed the General Conditions in the NWPs and

found that they merely provided "a list of options with little guidance on how they should be

selected or applied," and "loose instructions" lacking any "guarantee of successful mitigation."

Id. at 892-93. The OVEC court found itself "left with nothing but the Corps' unsupported belief"

in successful mitigation–a belief that was "rendered even less convincing by the Corps' concession

that mitigation plans sometimes fail." Id. at 894. That unsupported belief is shown by the Corps

conclusory statement that "we believe that the Corps can rely on mitigation in making a minimal

adverse environmental effects determination." 72 Fed. Reg. at 11116. Its concession of

mitgation failure is shown by its statement that the "ecological success of compensatory mitigation projects varies widely," and sometimes fails.  Id.  The Corps also acknowledged that its own official testified in the OVEC trial that "he did not know of a single instance of successful headwater stream creation."  Id. at 11115.

The Corps has also argued that it "will add permit conditions that require compensatory mitigation that meets specified success criteria."  Id. at 11115, 11153.  However, a commitment to establish unstated future "success criteria" does not show that mitigation can be effective or successful in achieving minimal effects.  Success criteria are merely part of a process, not a result.  Again, the Corps relied on a future process to avoid addressing the substantive basis for its decision.  The Corps' basic claim was that compensatory mitigation "will" reduce effects to a minimal level.  NWP 21 DD at 22, Pl. Ex. 1.  The Corps' reliance on "success criteria" begs the issue of whether this claim is reasonable.  The Corps never explained whether or how the success criteria could be achieved.  Without such an explanation or supporting evidence, the Corps' decision to rely on compensatory mitigation to achieve minimal effects is irrational.  It is merely a conclusory, unsupported presumption.  Both the OVEC court and the Fifth Circuit have held that the Corps cannot simply presume that compensatory mitigation will eliminate cumulative effects.[1] 604 F. Supp.2d at 886 n. 21; O'Reilly v. U.S. Army Corps of Engineers, 477 F.3d 225, 235 (5th Cir. 2007).

The Corps relied on that same unsupported presumption when it issued the 2007 NWPs.

---

[1]See also Nat'l Audubon Soc'y v. Hoffman, 132 F.3d 7, 17 (2d Cir. 1997) (agency relying on mitigation measures must provide "substantial evidence to support the efficacy of" those measures); Wyoming Outdoor Council v. U.S. Army Corps of Engineers, 351 F. Supp.2d 1232, 1252 (D. Wyo. 2005) (court cannot "defer to the Corps' bald assertions that mitigation will be successful" without any support in the record).

The Corps has provided no reasoned explanation or substantial evidence as to how compensatory mitigation will reduce the cumulative nationwide effects to a minimal level. Thus, the fundamental assumption underlying the Corps' decision on cumulative effects is fatally flawed, has no rational support in the record, and therefore violates the CWA, NEPA and the APA.

## II.     Plaintiffs Still Have Standing to Sue

Plaintiffs previously filed several standing declarations from their members, showing that they use and enjoy streams and associated natural resources in this District that have been or may be used for stream-filling activities under NWPs 21, 49 and 50. Doc. #13, Exhibits 7-18; #151-3, #151-4. Plaintiffs are filing three additional standing declarations with this brief. Pl. Ex. 5, 6, 7. The declarations of Plaintiffs' members show that they visit, live near, recreate near, drive by and/or fly over areas of this District that are visibly harmed by valley fills and related surface mining activities at the mining projects authorized under the 2002 NWPs 21, 49 and 50. Id. That harm offends their aesthetic interests, restricts and impacts their recreational activities and benefits, and decreases their enjoyment of nature, including the quality of Kentucky's streams, forests, landscapes and aquatic and terrestrial wildlife. Id. Judge Goodwin held in OVEC that these same types of injuries conferred standing to challenge NWP 21 in West Virginia. OVEC, 604 F. Supp.2d at 876-77.

The causation requirement for standing "is met when a plaintiff demonstrates that the challenged agency action authorizes the conduct that allegedly caused plaintiff's injuries, if that conduct would allegedly be illegal otherwise." Animal Defense Fund v. Glickman, 154 F.3d 426, 440 (D.C. Cir. 1998). By authorizing past stream-filling and valley fills under NWPs 21, 49 and 50, and by continuing to have the ability to issue new authorizations, the Corps' past and potential

actions are fairly traceable to these actual and threatened injuries to Plaintiffs's members. Valley

fills negatively affect the landscape, both directly by filling streams with rock, and indirectly by

allowing associated mining development.  OVEC, 604 F. Supp.2d at 868-69, 876.

These members' injuries will also be redressed by a favorable judicial decision.  If, as

Plaintiffs contend, the NWPs violate the CWA, the APA, and/or NEPA, additional stream-filling

will be restricted unless and until new valid NWP or individual § 404 permits are issued.  For

example, if, as Plaintiffs contend, valley fills have more than minimal cumulative effects, mines in

this District may have to obtain individual permits for new or expanded fills instead of NWP

authorizations.  The  procedures for issuing individual § 404 permits are more stringent than those

for NWP authorizations.  As EPA Region 9 explained in its comments on NWP 21:

> Clearly, the individual permit process provides greater protection to the aquatic
> environment than NWPs, if for no other reason than the requirement that each individual
> permit comply with EPA's 404(b)(1) Guidelines.  It follows, therefore, that to greatly
> expand the geographic applicability of the NWPs . . . will result in less regulatory scrutiny
> and, therefore, less protection to these waters.

Pl. Ex. 8, Enclosure, p. 1.  Conversely, an order restricting the Corps' use of NWPs, and leading

to more individual permit reviews, will provide greater protection to the environment near surface

coal mines, and therefore redress Plaintiffs' members' injuries.  The potential for more stringent

environmental regulation of natural resources used by plaintiffs is sufficient to confer standing.

OVEC v. Horinko, 279 F. Supp.2d 732, 745-46 (S.D. W.Va. 2003).

In addition, a party has procedural standing when he or she lives near the location of an

agency action and alleges that the agency failed to comply with required procedures before

approving a federal action concerning it.  Lujan v. Defenders of Wildlife, 504 U.S. 555, 572 n.

7 (1992); Hodges v. Abraham, 300 F.3d 432, 444 (4th Cir. 2002).  Plaintiffs' members meet this

test for procedural standing. Unlike with individual § 404 permits, the Corps does not provide

any public notice of NWP applications and administers the decision-making process in secrecy.

Compare 33 C.F.R. §§ 330.1(e), 330.6(a) with § 325.3. NWP 21 authorizations also require no

NEPA documentation and analysis of environmental impacts, while individual permits do.

Compare 33 C.F.R. § 330.1(e) with § 325.2(a)(4). Success on their claims could therefore

benefit Plaintiffs procedurally by making the Corps switch from NWPs to individual permits,

thereby giving Plaintiffs more opportunities for public participation in Corps decision-making and

making the process more transparent.

Plaintiffs need not demonstrate that the ultimate outcome following proper procedures

will benefit them. Oregon Natural Desert Ass'n v. Dombeck, 172 F.3d 1092, 1094-95 (9th Cir.

1998). When procedural rights are at issue, it is sufficient to show that there is "some possibility"

that the requested relief will prompt the injury-causing party to reconsider the decision that

allegedly harmed the litigant. Massachusetts v. EPA, 549 U.S. 497, 518 (2007). In this case,

there is much more than "some possibility" of such relief. After the U.S. District Court in West

Virginia issued a decision invalidating NWP 21 in that state, the Corps switched from processing

a fill application under NWP 21 to processing it as an application for an individual permit. Pl. Ex.

9, Decision Document for Independence Coal Company's Twilight MTR Surface Mine, March

15, 2007, p. 2. Plaintiffs therefore satisfy the requirements for procedural standing.

The area used by Plaintiffs' members encompasses streams and watersheds in eastern

Kentucky, including Martin, Pike, Perry, Knott, Boyd, Johnson, Floyd and Letcher Counties.

Plaintiffs previously listed some of the Corps' NWP authorizations in that area. See Doc. #141,

Mem. at 1. Since Plaintiffs prepared that list in 2008, Plaintiffs have determined through FOIA

requests that the Corps has issued 18 additional authorizations under the 2007 NWPs 21, 49 and 50 for surface coal mines in this same area:

| Date Issued/ Comment | Name | Permit No. | County | Stream | NWP Type |
|---|---|---|---|---|---|
| 1/25/08 | Enterprise Mining | LRL-2007-1249 | Perry (near Dunraven) | Jake Campbell Branch, North Fork Ky River | 50 |
| 3/5/08 | Cheyenne Resources | LRL-2007-1565 | Knott (near Kodak) | Montgomery Creek, North Fork Ky River | 21 |
| 5/22/08 | Clintwood Elkhorn | LRL-2006-1116 | Pike (near Dunlap) | Big Creek, Levisa Fork | 21 |
| 5/23/08 | Clintwood Elkhorn | LRL-2007-1548 | Pike (near Dunlap) | Third Fork of Big Creek, Levisa Fork | 50 |
| 5/22/08 | Raven | LRL-2006-1519 | Floyd (near Grethel) | Mud Creek, Toler Creek, Levisa Fork | 21 |
| 8/18/08 | H&D Coal | LRL-2008-650 | Knott (near Redfox) | Breeding Branch, Breeding Creek, Carr Fork, North Fork Ky River | 21 |
| 9/12/08 | Clintwood Elkhorn | LRL-2008-612 | Pike (near Rockhouse) | Bad Fork, Rockhouse Creek, Levisa Fork | 50 |
| 11/04/08 | ICG Hazard | LRL-2008-992 | Perry (near Bonnyman) | Sam Campbell Branch, North Fork Ky River | 21 |
| 11/05/08 | Beech Creek | LRL-2008-214 | Pike (near Jamboree) | Beech Creek, Left Fork of Peter Creek, Tug Fork | 21 |
| 11/12/08 | Miller Bros. | LRL-2008-961 | Johnson (near Whitehouse) | Laurel Fork of Nats Creek, Levisa Fork | 21 |
| 11/12/08 | Locust Grove | LRL-2008-869 | Perry (near Hazard) | Brown's Fork, Messer Branch, North Fork Ky River | 21 |
| 11/14/08 | Frasure Creek Mining | LRL-2008-1167 | Floyd (near David) | Alum Lick Fork, Levisa Fork | 21 |
| 12/31/08 | Schoate Mining–Briar Hill Mine | LRL-2008-346 | Muhlenberg (near Central City) | Little Cypress Creek, Green River | 21 |
| 1/21/09 | Nally & Hamilton | LRL-2008-751 | Leslie (near Helton) | Marrowbone Creek, Middle Fork Ky River | 21 |

| 3/12/09 | Sapphire Coal | LRL-2007-1645 | Letcher (near Colson) | Buck Creek, Alum Lick Fork, Rockhouse Creek, North Fork Ky River | 21 |
| 6/3/09 | ICG | LRL-2008-666 | Perry (near Ary) | Williams Branch, Mac and Nellie Branch, Troublesome Creek, North Fork Ky River | 21 |
| 8/27/09 | Enterprise Mining | LRL-2009-422 | Knott (near Sassafras) | Kelly Fork, Montgomery Creek, Carr Fork, North Fork Ky River | 21 |
| 9/4/09 | Pine Branch Coal Sales | LRL-2009-198 | Perry (near Napfor) | Rye Branch Creek, Napier Branch, North Fork Ky River | 21 |

See Pl. Ex. 10. Since all of the NWP 21 authorizations listed above were issued before the

Corps' June 18, 2010 suspension decision, they are grandfathered and still in effect. 75 Fed. Reg.

at 34714.[2] In addition, the Corps has proposed to issue at least the following three additional

authorizations on which EPA has submitted comments:

| Date of EPA Comment | Name | Permit No. | County | Stream | NWP Type |
|---|---|---|---|---|---|
| 8/3/10 | Sapphire Coal–Smoot Creek Surface Min | LRL-2009-849 | Letcher | Smoot Creek, North Fork of Ky River | 49 |
| 3/25/10 | ICG–Lige Hollow Auburgh Deep Mine | LRL-2009-95 | Knott | Lige Hollow, Caney Fork, Right Fork Beaver Creek, Lower Levisa Fork | 50 |
| 4/22/10 | Nally & Hamilton | LRN-2007-1642 | Bell | Tom Fork, Cumberland River | 49 |

---

[2]The Corps does not require NWP authorization holders to report publicly or to the Corps on the status of their stream-filling activities after an authorization is issued. Consequently, Plaintiffs cannot presently determine the current construction status of these authorizations.

See Pl. Ex. 11.[3]

Nevertheless, Plaintiffs' standing does not depend on the construction status of any of these authorizations or any other particular authorization that the Corps may have issued. Even if all of these projects have completed their authorized allotment of stream-filling, Plaintiffs would still meet the redressability requirement for standing, for several reasons.

First, Plaintiffs' remaining claims focus on the Corps' failure to analyze adequately the cumulative impacts of all past, pending, and potential future NWP authorizations. Plaintiffs are not challenging particular past authorizations on a site-specific basis, but instead are challenging the Corps' cumulative impacts methodology for all authorizations (past and future) because the Corps failed to consider a required factor (the effects of past authorizations), offered a conclusory and irrational justification for its minimal impact determination, and relied on an unsupported belief in the efficacy of mitigation. As a result, the completion status of any one past authorization, or all of those past authorizations, does not remedy or moot the Corps' failure to perform an adequate cumulative effects analysis when it issued the NWPs in 2007 and when it considers issuing new authorizations. The whole purpose of such an analysis is to evaluate the synergistic and comprehensive effects of multiple past and present NWP activities on the entire Appalachian stream network–something that the Corps has never done. See Idaho Conservation League v. Mumma, 956 F.2d 1508, 1516 (9th Cir. 1992) (court analyzed standing based on the programmatic authorization rather than later site-specific authorizations because "the standing

_____

[3]Again, Plaintiffs have not been able to determine whether these NWP authorizations have been issued.

examination . . . must focus on the likelihood that the defendant's action will injure the plaintiff in the sense contemplated by Congress").

Plaintiffs' members have a geographic nexus to that stream network, and the Corps' failure to analyze and document fully the cumulative effects on that network increases the risk of injury to Plaintiffs' members' environmental interests. For example, the Corps' failure to demonstrate and explain why mitigation is likely to succeed and to reduce the cumulative impacts to a minimal level increases the risk that there is unaddressed and unmitigated environmental harm that adversely affects Plaintiffs' members' interests in the affected watersheds in eastern Kentucky that contain mineable coal. The Corps' failure to conduct a proper cumulative impacts analysis is sufficient injury to support standing because it has increased the risk of injury to the natural resources which Plaintiffs' members use and enjoy. Northwest Environmental Defense Center v. Owens Corning Corp., 434 F. Supp.2d 957, 968 (D. Or. 2006) (in analyzing standing, "the challenged harm often results from the cumulative effects of many separate actions that, taken together, threaten the plaintiff's interests"); Wyoming v. U.S. Dept. of Agriculture, 570 F. Supp.2d 1309, 1330 (D. Wyo. 2008).

Second, as we have shown above, Plaintiffs' members have suffered, and continue to be threatened with, procedural harm as a result of the Corps' illegal cumulative impact analysis. Plaintiffs contend that the Corps has violated their procedural rights by issuing the 2007 NWPs 21, 49 and 50 without performing the required analysis of cumulative effects in a reasoned manner. Because "'NEPA is essentially a procedural statute designed to ensure that environmental issues are given proper consideration in the decisionmaking process,'" injury alleged to have occurred as a result of violating this procedural right confers standing. Idaho

Conservation League, 956 F.2d at 1514.  As a result of that violation, the Corps has issued illegal

NWP authorizations which do not require public notice or an opportunity for public comment.

"Instead, upon receipt of the authorization, permittees can immediately begin discharging dredged

and fill material without [Plaintiffs'] knowledge."  OVEC, 604 F. Supp.2d at 876.  That

environmental harm directly affects Plaintiffs' interests in the integrity of streams and associated

natural resources and "is immediate, irreversible, and difficult to monitor."  Id.  If Plaintiffs

succeed on their claims that the Corps performed an illegal cumulative impact analysis, then there

is a strong likelihood that the Corps would have to shift to issuing individual permits, which

require public notice of, and opportunity to comment on, permit applications.  Plaintiffs therefore

satisfy the requirements for procedural standing.

Third, the Corps has not made any commitment to revoke the suspended NWP 21

permanently, did not make that suspension retroactive to previously issued authorizations, and has

not made any commitment to refrain from issuing any new authorizations under the unsuspended

NWPs 49 and 50.  As this Court recognized in its January 28, 2011 Order:

> NWP 21 has merely been suspended; it was not revoked and will not expire until March
> 2012.  Additionally, the activity that Plaintiffs seek to enjoin is still occurring, as prior
> authorizations remain effective and filling activities can continue under those
> authorizations until March 2013. See 7[5] Fed. Reg. at 34714. Furthermore, as
> Defendants admit, the Corps has not suspended NWPs 49 and 50. Therefore, the Court
> finds that the instant action is not moot.

Doc. #173, p. 3.  NWP 21 is only temporarily suspended and could be reinstated at any time.  See

75 Fed. Reg. at 34713 ("The suspension temporarily prohibits the use of NWP 21 . . .").  A

temporary suspension of laws or regulations is not sufficient to demonstrate mootness.[4]

---

[4]See Wyoming v. U.S. Dept. of Agr., 414 F.3d 1207, 1212 (10th Cir. 2005) (case is not
moot when "a party's change in position may be temporary and thus abandoned once the litigation

Indeed, the Corps recently noticed for public comment a proposal that could renew and reinstate NWP 21 in March 2012. 76 Fed. Reg. 9174, 9181-82 (Feb. 16, 2011). The Corps has proposed three options, one of which would revoke NWP 21 entirely and two others which would keep NWP 21 but impose more stringent limitations than those in the current NWP 21. 76 Fed. Reg. at 9181-82. The Corps' "preferred" option would impose a 300-foot limit on stream loss. Id. at 9181. In support of that option, the Corps stated that "the construction of valley fills for surface coal mining activities substantially alters the watersheds associated with headwater streams and has a greater potential to cause more than minimal adverse effects on the aquatic environment." Id. As the Corps acknowledged, "[i]n previously issued versions of NWP 21, there was no limit on losses of waters of the United States." Id. at 9182. Thus, the Corps has again acknowledged that NWP 21 in its present form may have more than minimal adverse effects.

In addition, regardless of the NWP 21 suspension, the Corps can issue additional new authorizations under NWPs 49 and 50 at any time. This threat of future harm during the full remaining five-year term of the NWPs (plus the extra year for completing permitted activities after permit expiration) is sufficient to support standing. Standing can be based on "actual or threatened injury." Valley Forge Christian College v. Americans United for Separation of Church

---

ends"); Rothe Development Corp. v. Department of Defense, 413 F.3d 1327, 1333 (Fed. Cir. 2005) ("the current suspension of the price-evaluation adjustment is insufficient, by itself, to demonstrate that the price-evaluation adjustment will remain suspended, especially considering the heavy burden of proof associated with mootness"); Anderson v. Spear, 356 F.3d 651, 654-56 (6th Cir. 2004) ("The legislature's suspension of the operation of extant laws is not sufficient to deprive this court of jurisdiction," for voluntary cessation does not of itself moot a case); Western Oil and Gas Ass'n v. Sonoma County, 905 F.2d 1287, 1290-91 (9th Cir. 1990) (federal legislation suspending offshore leases did not moot a challenge to local ordinances that attempted to regulate onshore activities related to those leases).

and State, 454 U.S. 464, 472 (1982). In OVEC, the court held that "[a]n injury can be actual and imminent without specific authorizations under the challenged permit." OVEC, 604 F. Supp.2d at 876. Because the Corps has not committed to revoke NWP 21 and can continue to issue new authorizations under NWPs 49 and 50, that same holding applies here.

## III. The Court Should Issue an Order Vacating and Remanding NWPs 21, 49 and 50 and Prohibiting the Corps from Issuing Any Further NWP 21, 49 or 50 Authorizations in This District

Plaintiffs request that this Court issue the same type of relief that Judge Goodwin granted in OVEC, i.e., vacating the illegal NWPs, remanding them to the Corps, and enjoining the Corps from issuing authorizations under those NWPs in the Eastern District of Kentucky "until the Corps prepares a revised EA or EIS and also determines" that the NWPs "will not have adverse cumulative impacts as required by CWA § 404(e)." 604 F. Supp.2d at 903. Under § 706 of the APA, this Court has the authority to "hold unlawful and set aside agency action" that is found to be (A) "arbitrary [and] capricious, . . . (C) in excess of statutory jurisdiction [or] authority . . . , [or] (D) without observance of procedure required by law. . . ." 5 U.S.C. § 706(2)(A), (C), (D). Plaintiffs have shown that the Corps' approvals of NWPs 21, 49 and 50 are arbitrary and capricious, and that its failure to prepare a EIS on those decisions violates NEPA.

Equitable principles support the issuance of injunctive relief. "[T]here is no adequate remedy at law to compensate the public for the harm caused by the disposal of fill material into waters of the United States or in wetlands." U.S. v. Malibu Beach, Inc., 711 F. Supp. 1301, 1313 (D.N.J. 1989). The destruction of streams and aquatic habitat by valley fills is imminent, permanent and irreparable. When environmental injury "is sufficiently likely . . . the balance of harms will usually favor the issuance of an injunction to protect the environment." Amoco

Production Co. v. Village of Gambel, 480 U.S. 531, 545 (1987). Plaintiffs' members have environmental, recreational, and aesthetic interests in the protection of Kentucky's mountains and streams, and those interests are irreparably harmed by their destruction. Bragg v. Robertson, 54 F. Supp.2d 635, 645-46 (S.D.W.Va. 1999). The harm to Plaintiffs greatly outweighs the harm to the Corps and § 404 applicants from the additional processing time needed to obtain individual permits for new or expanded fills. Alaska Center for the Environment v. West, 31 F. Supp.2d 714, 723 (D. Alaska 1998). "The economic loss to the [operator] from cessation of [filling] activities is far outweighed by the benefit to the community from the enjoining of activities adversely affecting the environment." U.S. v. Ciampitti, 583 F. Supp. 483, 499 (D.N.J. 1984). In addition, "[i]t is axiomatic that the public interest under the Clean Water Act requires strict enforcement of the statute so as to clean up the nation's waters and preserve the surrounding ecological environment." Id.

A district court has "broad power to restrain acts which are of the same type or class as unlawful acts which the court has found to have been committed or whose commission in the future, unless enjoined, may fairly be anticipated from the defendant's conduct in the past." N.L.R.B. v. Express Publ'g Co., 312 U.S. 426, 435 (1941). Once a plaintiff has demonstrated standing to challenge a specific final agency action, a federal court's "intervention may ultimately have the effect of requiring a regulation, a series of regulations, or even a whole 'program' to be revised by the agency in order to avoid the unlawful result that the court discerns." Lujan v. National Wildlife Federation, 497 U.S. 871, 894 (1990). "[T]he scope of injunctive relief is dictated by the extent of the violation established, not by the geographical extent of the plaintiff class." Califano v. Yamasaki, 442 U.S. 682, 702 (1978).

The key question is whether the violation is in fact "widespread enough to justify system wide relief." Lewis v. Casey, 518 U.S. 343, 359 (1996). If it is, systemwide relief may be granted. Id. at 360 n. 7. As in the OVEC case in West Virginia, Plaintiffs have demonstrated District-wide violations, thereby warranting District-wide relief in Kentucky. See Alaska Center for the Environment v. Browner, 20 F.3d 981, 985 (9th Cir. 1994) (granting state-wide injunction against EPA under the Clean Water Act where plaintiffs "established that they were adversely affected by the inadequate water quality of a representative number of waters throughout the state").

## Conclusion

For these reasons, the Court should grant Plaintiffs' motion for summary judgment, vacate the 2007 NWPs 21, 49 and 50, remand those NWPs to the Corps, and order the Corps to (1) suspend NWP 21, 49 and 50 authorizations for stream-filling in this District in each stream where the placement of mining spoil[5] in streams has not commenced, and (2) cease issuing any further authorizations pursuant to NWPs 21, 49 and 50 for surface mining activities in this District.

Respectfully submitted,

  s/Stephen A. Sanders
STEPHEN A. SANDERS
Appalachian Citizens Law Center
317 Main Street
Whitesburg, KY 41858
(606) 633-3929

JAMES M. HECKER
Public Justice
1825 K Street, N.W., Suite 200

---

[5]Mining spoil is overburden that has been removed during surface coal mining operations. 30 C.F.R. § 701.5.

Washington, D.C. 20036
(202) 797-8600

JOSEPH M. LOVETT
Appalachian Center for the Economy and the
 Environment
P.O. Box 507
Lewisburg, WV 24901
(304) 645-9006

Counsel for Plaintiffs

**List of Exhibits**

1       Corps Decision Document for 2007 NWP 21, March 1, 2007.

2       Corps Decision Document for 2007 NWP 49, March 1, 2007.

3       Corps Decision Document for 2007 NWP 50, March 1, 2007.

4       EPA, Mountaintop Mining/Valley Fills in Appalachia, Final Programmatic Environmental Impact Statement, October 2005 (excerpt).

5       Declaration of Rick Handshoe, dated February 28, 2011.

6       Declaration of Erica Urius, dated February 28, 2011.

7       Declaration of Tim Guilfoile, dated February 28, 2011.

8       Letter from EPA Region 9 to U.S. Army Corps of Engineers, October 9, 2001.

9       Corps Decision Document for Independence Coal Co. Twilight MTR Surface Mine, March 2008, pp. 1-2 (excerpt).

10      First pages for 18 NWP 21 and 50 authorizations in Kentucky, 2008-09.

11      First pages for 3 EPA comment letters on NWP 49 and 50 authorizations in Kentucky, 2010.