# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF KENTUCKY
### SOUTHERN DIVISION
### AT PIKEVILLE

CIVIL ACTION NO. 05-181-DLB

KENTUCKY RIVERKEEPER, INC., ET AL.                    **PLAINTIFFS**

vs.                    <u>**MEMORANDUM OPINION AND ORDER**</u>

COLONEL RAYMOND G. MIDKIFF, ET AL.                    **DEFENDANTS**

* * * * * * * * * * * * * *

Plaintiffs Kentucky Riverkeeper, Inc. ("Riverkeeper"), Kentuckians for the Commonwealth, Inc. (KFTC) and Kentucky Waterways Alliance, Inc. (KWA) commenced this action for declaratory and injunctive relief challenging the United States Army Corps of Engineers' ("the Corps") nationwide permitting program, and, specifically, its use in Kentucky, and throughout the Appalachian region generally, to issue permits for mining activities by, among others, the Intervenors and/or their members. Plaintiffs allege violations of the Clean Water Act (CWA), 33 U.S.C. § 1251, *et seq.*, National Environmental Policy Act (NEPA), 42 U.S.C. § 4321, *et seq.*, and Administrative Procedure Act (APA), 5 U.S.C. § 706(2)(A) and seek to enjoin the Corps from authorizing further discharges of dredged or fill material under nationwide permits 21, 49 and 50.

This matter is before the Court on the parties' renewed cross motions for summary judgment (Docs. # 179, 181, 183). The motions have been fully briefed (Docs. # 179-187), and the motions are now ripe for review. For the reasons set forth below, Plaintiffs' Renewed Motion for Summary Judgment (Doc. # 179) is **DENIED**, and Defendants'

1

Renewed Cross-Motion for Summary Judgment (Doc. # 183) and Intervenors' Cross-Motion for Summary Judgment (Doc. # 181) are **GRANTED**.

## I. STATUTORY AND REGULATORY FRAMEWORK

### A. Clean Water Act (CWA)

The congressionally-expressed goal of the Clean Water Act (CWA) "is to restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a). In furtherance of this goal, the CWA prohibits the discharge of any "pollutant" into "navigable waters" of the United States without a permit. *See* 33 U.S.C. §§ 1311(a), 1344(a). Under the CWA, the Secretary of the Corps has authority to issue two types of permits for the discharge of dredged or fill material: (1) individual permits and (2) general permits. 33 U.S.C. § 1344. Individual permits may be issued under § 404(a) "after notice and opportunity for public hearings for the discharge of dredged or fill material into the navigable waters at specified disposal sites." *Id.* § 1344(a). On the other hand, general permits, which authorize "categor[ies] of activities" rather than individual projects, may be issued under § 404(e) on a state, regional or nationwide basis. *Id.* § 1344(e)(1). That section provides that:

> the [Corps] may, after notice and opportunity for public hearing, issue general permits ... for any category of activities involving discharges of dredged or fill material if the [Corps] determines that the activities in such category are similar in nature, will cause only minimal adverse environmental effects when performed separately, and will have only minimal cumulative adverse effect on the environment. Any general permit issued under this subsection shall ... set forth the requirements and standards which shall apply to any activity authorized by such general permit.

*Id.* The Corps provides prior notice and opportunity for public comment by publication in the Federal Register and by District Public Notice. 5 U.S.C. § 553(b).

General permits must also be issued in accordance with the CWA § 404(b)(1) Guidelines developed by the Administrator of the U.S. Environmental Protection Agency (EPA) and published in 40 C.F.R. § 230, as well as in accordance with the Corps' own regulations. 33 C.F.R. § 320.2(f). The Guidelines prohibit discharges that "will cause or contribute to significant degradation of the waters of the United States." 40 C.F.R § 230.10(c). The Guidelines require the Corps to analyze more than fifteen different factors that could be impacted by activities authorized by a general permit. *Id.* §§ 230.1-.7. The Guidelines stress the consideration of practicable alternatives, the analysis of impacts of the fill material on the aquatic area, and the minimization of the adverse effects of the discharges. *See id.* §§ 230.10, .11, .70-.77.

The Guidelines further provide that in order for the Corps to reach the determination that the category of activities are (1) similar in nature, (2) will have only minimal adverse effects when performed separately, and (3) will have only minimal cumulative adverse effects on the environment, the Corps "shall set forth in writing an evaluation of the potential individual and cumulative impacts of the category of activities to be regulated under the General permit." *Id.* § 230.7(b). The evaluation must be completed prior to the General permit being issued, and the results must be published with the final permit. *Id.* In addition, the EPA may veto the issuance of a permit by the Corps if the discharge of material at the site will have an "unacceptable adverse effect on municipal water supplies, shellfish beds and fishery areas (including spawning and breeding areas), wildlife, or recreational areas." 33 U.S.C. § 1344(c); *see also* 33 C.F.R. § 320.2(f). Moreover, under the Corps' regulations, the Corps must also conduct a detailed public interest review that analyzes twenty different factors, in which "[t]he benefits which reasonably may be

3

expected to accrue from the proposal must be balanced against its reasonably foreseeable detriments." 33 C.F.R. § 320.4(a)(1).

General nationwide permits are not open-ended. Rather, nationwide permits may not be issued for a period of more than five years, during which time the Corps retains the authority to modify, reissue or revoke the permits. *Id.* § 330.6(b). Additionally, the Corps "may require an individual permit for any proposed activity under a General permit where the nature or location of the activity makes an individual permit more appropriate." 40 C.F.R. § 230.7(b)(2). The Corps also uses compensatory mitigation to "offset environmental losses resulting from unavoidable impacts ... ." 33 C.F.R. § 332.3(a)(1). Permissible mitigation methods include restoration, enhancement, establishment, preservation, and even an in-lieu fee program. *Id.* § 332.3(a), (b). An in-lieu fee program is "a program involving the restoration, establishment, enhancement, and/or preservation of aquatic resources through funds paid to a governmental or non-profit natural resources management entity to satisfy compensatory mitigation requirements for [Department of the Army] permits." *Id.* at § 332.2.

Provided that all applicable conditions of the general permit are satisfied, a proposed activity falling within a pre-approved general permit category may be authorized, without the need to obtain an individual permit. *Id.* §§ 320.1(c), 330.1(c), 330.4(a), 325.5(c)(2). The Nationwide Permit (NWP) program also provides mechanisms for the Corps' districts and divisions to respond to local conditions to ensure that any environmental effects are minimal. In addition to the review conducted by the Corps' Chief of Engineers before issuing a NWP, division engineers may modify NWPs and add regional conditions to limit their use and protect important resources. *Id.* § 330.5(c)(1). Moreover, if a division

4

engineer determines that the use of a NWP to authorize activities within a particular watershed or geographic location will result in more than minimal individual or cumulative effects on the aquatic environment, then he or she may modify, suspend or revoke the NWP in that location. *Id.* § 330.4(e)(1). District engineers may impose project-specific conditions on NWPs to further ensure that aquatic resources and the public interest are protected. *Id.* § 330.1(d).

In most cases, applicants may proceed with authorized activities without notifying the district engineer. *Id.* §§ 330.1(e)(1). However, for NWPs that require advance notice and approval, a project proponent must provide a pre-construction notification (PCN) to the district engineer. *Id.* Upon receiving a PCN, the district engineer must determine whether the activity complies with the terms and conditions of the NWP and notify the project proponent accordingly. *Id.* §§ 330.1(e), 330.6(a). The district engineer may add additional conditions to ensure compliance with the statutory and regulatory requirements that the discharge result in minimal individual and cumulative adverse effects on the environment. *Id.* § 330.6(a)(3)(i). Moreover, if the adverse effects of a specific proposed project are more than minimal, the district engineer may exercise discretionary authority to require an individual permit for the proposed work. *Id.* §§ 330.1(d), 330.4(e), 330.5(c)&(d).

## B. National Environmental Policy Act (NEPA)

NEPA is designed to "promote efforts which will prevent or eliminate damage to the environment and biosphere and stimulate the health and welfare of man." 42 U.S.C. § 4321. Unlike the CWA, NEPA achieves this purpose by imposing procedural requirements that the agency must follow before taking action. *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350 (1989). Moreover, NEPA requires the agency to broadly

disseminate its findings on the environmental impacts of its actions. *Id.* NEPA is a procedural statute, not a substantive one. *Id.* (citations omitted) ("Although [NEPA] procedures are almost certain to affect the agency's substantive decision, it is now well settled that NEPA itself does not mandate particular results, but simply prescribes the necessary process."). Thus, agency action that produces adverse environmental effects can still be NEPA-compliant so long as the agency has considered the adverse effects and determined that competing policy values outweigh those effects. *Id.* "[T]he only role for a court is to insure that the agency has considered the environmental consequences; it cannot interject itself within the area of discretion of the [agency] ... ." *Strycker's Bay Neighborhood Council, Inc. v. Karlen*, 444 U.S. 223, 227 (1980) (internal quotation marks and citations omitted).

Under § 102 of NEPA, a federal agency must prepare a detailed environmental impact statement (EIS) for all "major Federal actions significantly affecting the quality of the human environment ... ." 42 U.S.C. § 4332(2)(C). The EIS must detail (1) the environmental impact of the proposed action, (2) any adverse environmental effects which cannot be avoided should the proposal be implemented, (3) alternatives to the proposed action, (4) the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity, and (5) any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented. *Id.*

Congress established the Council on Environmental Quality (CEQ) to assist federal agencies in the application of NEPA . The CEQ has promulgated extensive regulations to guide the implementation of NEPA's environmental impact assessment process. *See* 40

C.F.R. § 1500.3.

In order to determine whether an action is one requiring an EIS, the agency shall prepare an environmental assessment (EA). 40 C.F.R. §§ 1501.4(b)-(c), 1508.9. The EA must "[b]riefly provide sufficient evidence and analysis for determining whether to prepare an environmental impact statement ... ." *Id.* § 1508.9(a)(1). The EA "[s]hall include brief discussions of the need for the proposal, of alternatives as required by section 102(2)(E), of the environmental impacts of the proposed action and alternatives, and a listing of agencies and persons consulted." *Id.* § 1508.9(b). If no significant impacts are identified in the EA, an agency may finalize its decision after making a "finding of no significant impact" (FONSI) without having to prepare an EIS. *Id.* § 1501.4(e). Significance is determined by evaluating the context of the proposed action and the intensity, or severity, of its potential environmental impacts. *Id.* § 1508.27.

However, even if the EA identifies significant environmental impacts, several circuits have endorsed the issuance of a so-called "mitigated FONSI." *Spiller v. White*, 352 F.3d 235, 241 (5th Cir. 2003). This means that when an agency finds that mitigation measures would render insignificant any environmental impacts resulting from the activity, the agency can forego the issuance of an EIS. *Ohio Valley Envtl. Coal. v. Aracoma Coal Co.*, 556 F.3d 177, 191-92 (4th Cir. 2009) (citation omitted); *see also Tillamook Cnty. v. U.S. Army Corps of Eng'rs*, 288 F.3d 1140, 1144 (9th Cir. 2002); *Audubon Soc'y of Cent. Ark. v. Dailey*, 977 F.2d 428, 435-36 (8th Cir. 1992); *C.A.R.E. Now, Inc., v. Fed. Aviation Admin.*, 844 F.2d 1569, 1575 (11th Cir. 1988); *Cabinet Mountains Wilderness/Scotchman's Peak Grizzly Bears v. Peterson*, 685 F.2d 678, 682 (D.C. Cir. 1982); *Forest Serv. Emps. for Envtl. Ethics v. U.S. Forest Serv.*, 689 F. Supp. 2d 891, 898 (W.D. Ky. 2010) (citing *Aracoma Coal Co.*,

556 F.3d at 206).

### C. The Surface Mining Control and Reclamation Act (SMCRA)

NWPs 21, 49 and 50 apply to activities that are being processed or have already been authorized under the SMCRA, 30 U.S.C. §§ 1201, *et seq.* (Docs. # 179-3; # 179-4; # 179-5). The purpose of the SMCRA, among other things, is to "assure that surface coal mining operations are so conducted as to protect the environment." 30 U.S.C. § 1202(d). SMCRA permits are issued by the Office of Surface Mining Reclamation and Enforcement (OSM) of the United States Department of the Interior (DOI), unless the state has an OSM-approved program. *Id.* §§ 1211(c)(1), 1253. To obtain approval of such a program, the State must pass a law that provides for the SMCRA's minimum national standards and demonstrate that it has the capability of enforcing its law. *Id.* § 1253(a). Kentucky has an approved program, and the SMCRA permits are issued by the Kentucky Department for Natural Resources (KDNR) with oversight by OSM. 30 C.F.R. § 917.11.

The SMCRA permitting process is a public process and requires notice, a comment period and, if requested, an informal conference for objections to be heard. 30 U.S.C. § 1263. Any permit issued under the SMCRA "shall require that such surface coal mining operations will meet all applicable performance standards ... and such other requirements as the regulatory authority shall promulgate." *Id.* § 1265(a). These performance standards include, among others, "requirements for restoration of land to its prior condition after mining, restoration of land to its approximate original contour, segregation and preservation of topsoil, minimization of hydrologic disturbances from mining, construction of coal mine waste piles used as dams or embankments, utilization of explosives, revegetation of mined areas, reclamation of mountaintop mines, and spoil disposal for steep-slope mines." *In re*

*Surface Mining Regulation Litig.*, 627 F.2d 1346, 1350 (D.C. Cir. 1980) (citing 30 U.S.C. § 1265). For example, all surface coal mining operations must "minimize the disturbances to the prevailing hydrologic balance at the mine-site and in associated offsite areas and to the quality and quantity of water in surface and ground water systems both during and after surface coal mining operations and during reclamation ... ." 30 U.S.C. § 1265(b)(10).

When applying for a SMCRA permit, the applicant must determine the probable hydrologic consequences of the proposed action, both on the mine site and on the surrounding area. 30 C.F.R. § 780.21(f). This determination is used by the regulatory authority to conduct a cumulative hydrologic impact assessment (CHIA) on the "cumulative impact area" in order to ascertain "whether the proposed operation has been designed to prevent material damage to the hydrologic balance outside the permit area." *Id.* § 780.21(g)(1). Moreover, the SMCRA requires that each permit application "include a description of the existing, premining environmental resources within the proposed permit area and adjacent areas that may be affected or impacted by the proposed surface mining activities." *Id.* § 779.11.

## II.  FACTUAL AND PROCEDURAL BACKGROUND

This case involves challenges to the United States Army Corps of Engineers' decision to issue three nationwide permits: NWP 21[1], authorizing the discharge of dredged and fill material into waters of the United States associated with surface coal mining and reclamation operations, provided the activities are already authorized, or are currently being

_____

[1] This case was originally brought only as a challenge to NWP 21, reissued on January 15, 2002 and effective on March 18, 2002.  (Doc. # 1, at ¶ 1).  However, during the pendency of the action, the 2002 NWP 21 expired and was reissued on March 12, 2007 and effective on March 19, 2007.  72 Fed. Reg. 11092, at 11092 (Mar. 12, 2007).  Thereafter, the Plaintiffs filed a Supplemental Complaint (Doc. # 128) challenging the 2007 NWP 21 and two new NWPs, 49 and 50.  These NWPs will expire on March 18, 2012.  *Id.* at 11092.

processed as part of an integrated permit processing procedure, by the Department of the Interior, Office of Surface Mining, or by states with approved programs under Title V of the SMCRA; NWP 49, authorizing the discharge of dredged or fill material into waters of the United States associated with the remining and reclamation of lands that were previously mined for coal, provided the projects are authorized by OSM or by states with approved programs under Title IV or V of SMCRA; and NWP 50, authorizing the discharge of dredged or fill material into waters of the United States associated with underground coal mining and reclamation operations, provided the projects are authorized by OSM or by states with approved programs under Title V of SMCRA.  72 Fed. Reg. 11092, at 11113, 11147, 11151 (Mar. 12, 2007).  Prior to issuing these NWPs, the Corps determined that the regulated activities will result in minimal adverse environmental effects when considered both individually and cumulatively.  *See* (Docs. # 179-3; 179-4; 179-5).

The Corps supported its determination that the regulated activities will have no more than minimal adverse environmental effects by requiring mitigation to offset any adverse impacts.  General Condition 20, Mitigation, provides that compensatory mitigation is required for permanent losses of waters of the United States, or for permanent adverse effects to aquatic resource functions.  72 Fed. Reg. 11092, at 11163.  "Compensatory mitigation requirements will be determined by district engineers on a case-by-case basis, after considering relevant and available information, such as the ecological conditions of the project site, the type of activity, the impacts of the activity on the aquatic environment and other public interest factors, and the type of aquatic resources that will be adversely affected by the NWP activity."  *Id.* at 11164.

Furthermore, NWPs 21, 49 and 50 each require a case-by-case review of each project before any activity may begin. Each applicant must submit a pre-construction notification (PCN) for all activities proposed to be authorized pursuant to the permits and must receive written authorization from the district engineer before proceeding. *Id.* at 11114, 11147, 11151. This written verification is unique to NWPs 21, 49 and 50.[2] Moreover, the district engineer must approve the compensatory mitigation proposal before the activity may commence. *Id.* at 11195. If the district engineer finds that the environmental impacts of a proposed activity are more than minimal, "discretionary authority will be exercised and either the NWP will be conditioned to require mitigation or other actions to ensure minimal adverse effects or an individual permit will be required." *Id.* at 11095.

In order "to identify and quantify the functions lost through authorized impacts and the functions gained or enhanced through mitigation," the Corps developed new stream functional assessment protocols. (Docs. # 183-3, at 9; 183-4, at 7; 183-5, at 8). In Eastern Kentucky, all activities authorized under NWPs 21, 49 and 50 utilize the Eastern Kentucky Stream Assessment Protocol ("the Protocol"), which was developed by an interagency team including members from the Corps, the EPA, the U.S. Fish and Wildlife Service (USFWS), the Kentucky Division of Water (KDOW), and the Kentucky Department of Fish and Wildlife Resources (KDFWR). (Doc. # 183-6, at 1).

The Protocol assesses the environmental quality of a particular headwater stream ecosystem based on data reflecting its physical, chemical and biological characteristics.

_____

[2] Under other NWPs that require PCNs, the permittee may presume that his project qualifies for the NWP unless he is otherwise notified by the district engineer within thirty days. 33 C.F.R. § 330.1(e)(1).

(Doc. # 183-7, at ¶ 10)[3].  This data serves as an indicator of the headwater stream's capacity to perform aquatic functions and is scored on a scale–known as the Ecological Integrity Index (EII)–from 0.1 to 1.0, with 1.0 representing streams with the highest environmental quality.  *Id.*  Then, the EII score is multiplied by the length of the proposed impact to get an estimate of the functional capacity known as Ecological Integrity Units (EIUs).  *Id.*  The EIUs represent both the quality and quantity of a particular site.  *Id.*

The Protocol first requires a site characterization and description of the stream (e.g., origin and type) and the landscape.  *Id.* at ¶ 14.  This includes a summary of the riparian vegetation features and measurements of in-stream parameters such as width, depth, flow and substrate.  *Id.*  Additionally, the characterization phase requires a screening for "red flag" issues, such as endangered species or cultural resources.  *Id.*

The next step involves a site assessment of two broad components–the biotic (living, biological constituents) component and the abiotic (non-living, physical and chemical constituents) component.  *Id.* at ¶ 15.  The biotic component measures five biological characteristics, based on the Macroinvertebrate Bioassessment Index (MBI), a study done by members of the KDOW, that are indicative of water quality.  *Id.* at ¶¶ 16-18.  The abiotic component assesses the stream's ability to conduct an electrical current.  *Id.* at ¶ 20.  Several studies have found that sites with greater conductivity level are less likely to be able to support and maintain biological communities.  *Id.* at ¶ 21.  The abiotic component also assesses the physical integrity of a site in accordance with the Rapid Bioassessment

---

[3] Once again, Plaintiffs object to the Court's consideration of the Declaration of Suzanne Louise Chubb (Doc. # 183-7) because it is not a part of the administrative record.  However, as previously stated in the Court's March 26, 2007 Order (Doc. # 103), the Court is mindful that the declaration is not a part of the administrative record and its consideration is solely to provide useful background and context information regarding the Protocol.

Protocol (RBP) developed by the EPA. *Id.* at ¶ 22. This includes an assessment of ten parameters pertinent to habitat quality. *Id.* at ¶ 23. These three (biological, chemical and physical) subindices are then averaged together to calculate the EII, which is then multiplied by the number of linear feet representing the stream condition, yielding the EIUs. *Id.* at ¶¶ 25, 28.

The final step is a mitigation analysis that uses the calculated EIUs to quantify the potential impact to a particular site and the compensatory mitigation needed to offset the unavoidable impacts to the aquatic environment. *Id.* at ¶ 29. Thus, if a proposed project would result in a loss of 1,000 EIUs, a mitigation plan resulting in a gain of at least 1,000 EIUs would be required. *Id.* The mitigation analysis also analyzes other factors, such as the time needed for full replacement of aquatic functions and the likelihood of success of the mitigation measures. *Id.* at ¶ 30.

As a last resort for compensatory mitigation, the Corps may authorize the permittee to pay an in-lieu-fee (ILF) fund, but only if the Corps determines that the project has avoided and minimized potential impacts to the aquatic environment and that on-site and off-site compensatory mitigation is not practicable. *Id.* at ¶ 33. This fund is managed by the KDFWR and contributes to mitigation projects that are meant to offset the impacts that generated the ILF. *Id.* Mitigation Banking Review Team (MBRT), an interagency committee composed of representatives from the EPA, USFWS, KDFWR, KDOW and the Corps, reviews and approves all ILF projects. *Id.* at ¶ 34.

While cross motions for summary judgment were pending, the Corps published a notice of its intention to suspend and/or modify NWP 21. 74 Fed. Reg. 34311 (July 15, 2009). The Corps proposed to suspend NWP 21 to provide an interim means of requiring

13

individual permit reviews in the Appalachian region, including Kentucky, while proposing to undertake the longer-term measure of modifying NWP 21 to prohibit its use to authorize discharges of dredged or fill material associated with surface coal mining in the Appalachian region. *Id.* Thereafter, the Court stayed this proceeding pending final action on the proposal to suspend or modify NWP 21 and denied without prejudice the pending cross motions for summary judgment. (Doc. #164).

On June 18, 2010, the Corps suspended the use of NWP 21 in the Appalachian region of Kentucky, Ohio, Pennsylvania, Tennessee, Virginia and West Virginia. 75 Fed. Reg. 34711, 34712 (June 18, 2010). This suspension remains in effect "until the Corps takes further action on NWP 21 or until NWP 21 expires on March 18, 2012." *Id.* Thus, the suspension is only temporary. *Id.* at 34713. Furthermore, the suspension only applies prospectively to prohibit District Engineers from "continu[ing] to process NWP 21 PCNs that are pending as of June 18, 2010 or accept[ing] new or revised NWP 21 PCNs ... ." *Id.* at 34714. However, the Corps has "grandfathered" existing NWP 21 authorizations that were verified prior to June 18, 2010. *Id.* The Corps explained in its June 8, 2010 Decision Document:

> Activities that were verified under NWP 21 by district engineers prior to the effective date of the suspension will continue to be authorized by that NWP, unless the district engineer takes action to modify, suspend or revoke a particular NWP authorization on a case-by-case basis in accordance with the procedures at 33 CFR §330.5(d). Verified work in waters of the United States at many of these sites has been completed already under the terms and conditions of the NWP 21 verifications. This completed work in waters continues to be authorized by NWP 21. For discharges of dredged or fill material into waters of the United States that have not been completed, applicants will have until 18 March 2012 to complete authorized work. Further, under the grandfathering provision, permittees will have until 18 March 2013 to complete the authorized work if they have commenced work

or are under contract to complete the activities prior to that date.[4]

Therefore, grandfathered projects have until March 2013 to continue filling streams under the existing authorizations.

As stated above, by their terms, the 2007 NWPs 21, 49 and 50 will expire on March 18, 2012. Therefore, on February 16, 2011, the Corps published another proposal to reissue and/or modify the existing NWPs. 76 Fed. Reg. 9174 (February 16, 2011). This proposal also contained three options concerning NWP 21: (1) not reissue the permit; (2) reissue with modifications, including a one-half acre limit for losses of non-tidal waters, a 300 linear foot limit for the loss of stream bed (with a waiver for the loss of intermittent and ephemeral stream beds if the district engineer makes a written determination that the discharge will result in minimal adverse effects), and a provision prohibiting the use of the permit to authorize discharges of dredged or fill material into waters associated with the construction of valley fills for surface coal mining activities; or (3) reissue with the same modifications as described in Option 2, except there would be no provision prohibiting the use of NWP 21 to authorize discharges of dredged or fill material into waters associated with the construction of valley fills. *Id.* at 9181. The Corps' preferred option is Option 2 "since the construction of valley fills for surface coal mining activities substantially alters the watersheds associated with headwater streams and has a greater potential to cause more than minimal adverse effects on the aquatic environment." *Id.* Comments on the proposal were to be submitted on or before April 18, 2011. *Id.* at 9174. NWP 49 was proposed to

---

[4] This document is available on the Corp's website at http://www.usace.army.mil/CECW/Documents/cecwo/reg/nwp/NWP_21_Signed_Decision_Document_8_June_2010.pdf.

be reissued without material changes. *Id.* at 9183. NWP 50 was proposed to be reissued with modifications, including a one-half acre limit on losses of non-tidal waters, including the loss of no more than 300 linear feet of stream bed, unless for intermittent and ephemeral stream beds the district engineer waives the 300 linear foot limit by making a written determination concluding that the discharge will result in minimal adverse effects. *Id.* at 9184.

## III.    ANALYSIS

### A.    Standard of Review

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). However, the claims in this matter involve the Corps' issuance of three nationwide permits, which are final agency actions subject to judicial review under the Administrative Procedure Act (APA), 5 U.S.C. § 702. When conducting judicial review under the APA, the court does not resolve factual issues, but instead determines "whether or not as a matter of law the evidence in the administrative record permitted the agency to make the decision it did." *Sierra Club v. Mainella*, 459 F. Supp. 2d 76, 90 (D.D.C. 2006) (quoting *Occidental Eng'g Co. v. Immigration & Naturalization Serv.*, 753 F.2d 766, 769 (9th Cir. 1985)). Therefore, the standard set forth in Fed. R. Civ. P. 56(a) does not apply "because of the limited role of a court in reviewing the administrative record." *Id.* at 89 (citations omitted).

In issuing the challenged nationwide permits, the Corps was engaged in informal ("notice and comment") rule-making. *See* 33 U.S.C. § 1344(a). Informal rule-making done pursuant to Section 4 of the APA, 5 U.S.C. § 553, is reviewed under Section 10 of the APA,

5 U.S.C. § 706(2). Section 10 of the APA provides that the court must declare unlawful and set aside any agency action found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A); *N.E. Ohio Reg'l Sewer Dist. v. U.S. Envtl Protection Agency*, 411 F.3d 726, 731 (6th Cir. 2005). The court must consider whether the agency has "examine[d] the relevant data and articulate[d] a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (quoting *Burlington Truck Lines v. United States*, 371 U.S. 156, 168 (1962)). An agency action is arbitrary and capricious where the agency relied on factors that Congress did not intend it to consider, failed to consider an essential facet of the problem, gave a rationale for its decision that runs counter to the evidence before it, or is so unconvincing that it could not simply be a difference in view or the product of agency expertise. *Id.* The scope of review under the arbitrary and capricious standard is highly deferential, and a court should not substitute its judgment for that of the agency. *N.E. Ohio Reg'l Sewer Dist.*, 411 F.3d at 731-32. While the Court "may not supply a reasoned basis for the agency's action that the agency itself has not given," it may "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned." *Motor Vehicle Mfrs. Ass'n of the U.S., Inc.*, 463 U.S. at 43 (citations omitted).

When a court reviews an agency's construction of a statute that it administers, it must address two issues. *Chevron, U.S.A., Inc. v. Natural Res. Defense Council, Inc.*, 467 U.S. 837, 842 (1984). First, the court must determine whether Congress has "directly spoken to the precise question at issue." *Id.* If the answer is in the affirmative, the analysis ends. *Id.* The court and the agency must give effect to the clearly expressed intent of

Congress. *Id.* at 842-43. However, if the court finds that Congress has not addressed the precise question at issue, "the question for the court is whether the agency's answer is based on a permissible construction of the statute." *Id.* at 843. So long as the agency's interpretation of the statute is permissible, the court defers to the agency's interpretation even if the court would have reached a different conclusion. *Id.* at 843 n.11 (citations omitted); *see also Ky. Waterways Alliance v. Johnson*, 540 F.3d 466, 474 (6th Cir. 2008).

A court should also defer to an agency's interpretation of a regulation "unless it is plainly erroneous or inconsistent with the regulation." *Ky. Waterways Alliance*, 540 F.3d at 474 (citing *Auer v. Robbins*, 519 U.S. 452, 461 (1997)). As with statutory construction, deference is only warranted when the language of the regulation is ambiguous; unambiguous language should be given its plain meaning. *Id.* at 474-75 (citing *Christensen v. Harris Cnty.*, 529 U.S. 576, 588 (2000)).

**B. Standing**

The Intervenors assert that Plaintiffs lack standing to challenge NWPs 21, 49 and 50. In response, Plaintiffs KFTC and KWA submitted several declarations from their members to show that they have standing to maintain this action. (Docs. # 151-3; 151-4; 179-7; 179-8; 179-9). Moreover, all of the Plaintiffs previously submitted declarations from their members concerning specific activities authorized under the 2002 NWP 21. *See* (Doc. # 13, Exs. 7-18). However, since the 2002 NWP 21 has expired and any activities authorized under the 2002 version are no longer in effect, those declarations do not support Plaintiffs' ability to now challenge the 2007 NWPs 21, 49 and 50. Thus, since Plaintiff Riverkeeper has failed to submit any subsequent declarations from its members concerning the 2007 NWPs, it must be dismissed from this case on standing grounds.

Furthermore, for the reasons discussed more thoroughly below, because Plaintiffs KFTC and KWA have failed to identify any site-specific activities authorized under NWP 49 that are diminishing or threatening to diminish their members' enjoyment of particular river segments, Plaintiffs KFTC and KWA do not have standing to challenge NWP 49. Conversely. because Plaintiffs KFTC and KWA have identified site-specific activities authorized under NWPs 21 and 50 that are diminishing or threatening to diminish their members' enjoyment of particular river segments, Plaintiffs KFTC and KWA have standing to challenge NWPs 21 and 50.

An organization has standing to bring suit on behalf of its members where the members could sue in their own right, the interests involved are related to the organization's purpose, and the claim asserted and the relief requested do not require the participation of individual members in the suit. *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 181 (2000) (citing *Hunt v. Wash. State Apple Advertising Comm'n*, 432 U.S. 333, 343 (1977)); *Friends of Tims Ford v. Tenn. Valley Auth.*, 585 F.3d 955, 967 (6th Cir. 2009). The Intervenors challenge only the first prong of associational standing, arguing that the Plaintiffs' members do not have standing in their own right to challenge the NWPs.

In order to establish standing under the APA, a plaintiff must prove the "case or controversy" constitutional requirements of Article III and "demonstrate the inapplicability of 'prudential' limitations imposed by the APA." *Ctr. for Biological Diversity v. Lueckel*, 417 F.3d 532, 536 (6th Cir. 2005) (citing *Courtney v. Smith*, 297 F.3d 455, 460-61 (6th Cir. 2002)). To prove Article III standing, Plaintiffs' members must demonstrate: "(1) [they have] suffered an 'injury in fact' that is (a) concrete and particularized and (b) actual or imminent,

not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Friends of the Earth, Inc.*, 528 U.S. at 180-81. Furthermore, the APA imposes two additional requirements for standing, although they overlap substantially with the Article III requirements. *Ctr. for Biological Diversity*, 417 F.3d at 536; *see also Lujan v. Nat'l Wildlife Fed'n,* 497 U.S. 871, 882 (1990). Plaintiffs that sue a federal agency must also show that (1) the complaint "relate[s] to agency action" and (2) they "suffered either legal wrong or an injury falling within the zone of interests sought to be protected by the statute on which [their] complaint is based." *Ctr. for Biological Diversity*, 417 F.3d at 536 (internal quotation marks omitted). Plaintiffs bear the burden of showing that the standing requirements have been satisfied. *Id.*

### 1. Injury in Fact

The Intervenors argue that Plaintiffs' members declarations do not allege any use, or even knowledge, of the precise location of the fills they claim to have caused their injuries. Moreover, the Intervenors allege that because the affiants introduce their supposed knowledge of local conditions with the phrase, "as I understand it," the affidavits are not based on personal knowledge nor demonstrate that the affiants are competent to testify on the matters stated in the declarations. In other words, Intervenors allege that Plaintiffs have not shown that they suffered an injury in fact under the Article III standing requirements.

In environmental cases, the primary inquiry is whether the plaintiff has suffered an injury, not whether the environment has actually been harmed. *Friends of the Earth, Inc.*, 528 U.S. at 181. The Supreme Court has held that "environmental plaintiffs adequately

allege injury in fact when they aver that they use the affected area and are persons 'for whom the aesthetic and recreational values of the area will be lessened' by the challenged activity." *Id.* at 183 (citing *Sierra Club v. Morton*, 405 U.S. 727, 735 (1972)). Plaintiffs' members have submitted declarations that outline a number of aesthetic and recreational interests that have been damaged due to the Corps' authorizations of certain activities pursuant to the NWPs. ("[The water quality and the fishing got worse ... If the streams were cleaned up and the fishery returned, I would really enjoy fishing again ... ." (Doc. # 179-7); "I enjoyed the stream during my visits but I was extremely concerned about the pollution and sediment coming from the mines upstream. ... I would like to fish during our trips to the lake but refrain from fishing because of the pollution from the mines upstream. ... [I] refrain from swimming because of the water pollution." (Doc. # 179-8); "I did water quality sampling at a number of sites ... [and] I was very concerned about the water quality ... as the conductivity readings were all very high ... I also noted heavy siltation. ... The pollution is aesthetically offensive to me." (Doc. # 179-9)).

However, Article III standing also involves a specificity requirement. The Supreme Court has held that the specificity requirement of standing "is assuredly not satisfied by averments which state that ... [an individual] uses unspecified portions of an immense tract of territory ... ." *Lujan*, 497 U.S. at 889. In a recent opinion, the Sixth Circuit explained the difference between "sufficiently detailed standing affidavits and insufficiently detailed standing affidavits." *Heartwood Inc. v. Agpaoa*, 628 F.3d 261, 268 (6th Cir. 2010) (discussing *Ctr. for Biological Diversity*, 417 F.3d at 537-38). The Court noted that, in order to establish standing, the plaintiffs "must show that actual, site-specific activities are diminishing or threaten[ing] to diminish their members' enjoyment of the designated river

segments ... ." *Id.* (quoting *Ctr. for Biological Diverstiy*, 417 F.3d at 537). Thus, environmental plaintiffs seeking to demonstrate standing "must identify particular segments of a river ... that they use and will continue to use, and that agency action will detrimentally affect." *Id.* (citing *Ctr. for Biological Diversity*, 417 F.3d at 538).

In the instant case, Plaintiffs' KFTC and KWA members' affidavits present much more than the mere "general averments" and "conclusory allegations" found inadequate in *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888 (1990). In addition to the aesthetic and recreational interests , Plaintiffs' members have identified specific portions of lakes and streams where mining activities are occurring. See (Docs. # 179-7; 179-8; 179-9). For example, one member identifies activities in the "tributaries of Big Creek of Levisa Fork close to Dunlap, Kentucky." (Doc. # 179-8, at ¶ 4). Another member identifies activities in the "tributary in Lige Hollow of Caney Fork of the Right Fork of Beaver Creek near Hollybush." (Doc. # 179-7, at ¶ 4). Despite the Intervenors contention that because the affiants introduce their supposed knowledge of local mining activities with the phrase, "as I understand it," the affidavits demonstrate that the affiants are not competent to testify on the matters stated in the declarations, the fact that authorized activities exist at these locations is not in dispute. The Corps has produced a table that clearly illustrates that mining activities are taking place at these locations. (Doc. # 182-25). However, Plaintiffs' members declarations only identify mining activities authorized under NWPs 21 and 50, not 49. Therefore, Plaintiffs KFTC and KWA have adequately alleged an injury in fact as to NWPs 21 and 50, but they have not alleged an injury in fact as to NWP 49 and therefore do not have standing to challenge NWP 49.

### 2.        Traceability and Redressability

Intervenors also contend that Plaintiffs do not meet the traceability requirement because Plaintiffs' members have failed to relate the injuries they allege to the issuance of the three general permits at issue.  In support of this argument, Intervenors cite *Coeur Alaska, Inc. v. S.E. Alaska Conservation Council*, 129 S. Ct. 2458 (2009), claiming that the Plaintiffs have identified the wrong permits that control the discharge.   Intervenors argument is misplaced.

*Coeur Alaska, Inc.* stands for the proposition that "if the Corps has the authority to issue a permit for a discharge under § 404, then the EPA lacks the authority to do so under § 402." *Coeur Alaska, Inc.*, 129 S. Ct. at 2467.  Intervenors confuse the Supreme Court's holding to mean that only § 402 permits are designed to regulate water quality, not the § 404 permits that are at issue in the instant case.  Thus, Intervenors contend that standing only exists if the Plaintiffs assert interests at the "point of discharge," not miles from it.  However, Intervenors' attempt to limit Plaintiffs' members' interests to the point of discharge fails to recognize how the discharge of dredged or fill materials impacts downstream waterways.

Traceability does not mean that the plaintiffs must prove to a scientific certainty that the authorized discharges caused the specific harm suffered by the plaintiffs.  *Natural Res. Defense Council, Inc. v. Watkins*, 954 F.2d 974, 980 n.7 (4th Cir. 1992).  Instead, the plaintiffs must simply show that the authorized activities "discharge[] a pollutant that causes or contributes to the kinds of injuries alleged by the plaintiffs."  *Id.* at 980 (quoting *Public Interest Research Group of N.J., Inc. v. Powell Duffryn Terminals Inc.*, 913 F.2d 64, 72 (3d

Cir. 1990)) (internal quotation marks omitted). Plaintiffs have satisfied this requirement here.

The Corps has authorized several mining projects in the Eastern District of Kentucky pursuant to NWPs 21 and 50 that allow for the discharge of spoil into certain waters. (Doc. # 182-25). Furthermore, as the Corps identifies in its Decision Documents, a number of adverse environmental effects, including the very same injuries alleged by the Plaintiffs' members, can occur as a result of these discharges. *See e.g.,* (Doc. # 179-3, at 22, 24) ("Surface coal mining operations will alter the visual character of some waters ... Activities authorized by this NWP may alter the habitat characteristics of streams and wetlands, decreasing the quantity and quality of fish and wildlife habitat."). Therefore, Plaintiffs have sufficiently shown that their members' alleged injuries are fairly traceable to the challenged agency actions. Furthermore, Plaintiffs' members' injuries are likely to be addressed by a favorable decision, because the Court can vacate the use of the permits in the Eastern District of Kentucky and enjoin any activities that are currently taking place.

### 3.   APA's Additional Standing Requirements

In addition to Article III standing requirements, Plaintiffs must also show that (1) the complaint "relate[s] to agency action" and (2) they "suffered either legal wrong or an injury falling within the zone of interests sought to be protected by the statute on which [their] complaint is based." *Ctr. for Biological Diversity*, 417 F.3d at 536 (internal quotation marks omitted). Whether a claim is within the zone of interest protected by a statute must be evaluated "not by reference to the overall purpose of the Act in question, ... but by reference to the particular provision of law upon which the plaintiff relies." *Bennett v.*

*Spear*, 520 U.S. 154, 175-76 (1997); *see also Dismas Charities, Inc. v. U.S. Dep't of Justice*, 401 F.3d 666, 674 (6th Cir. 2005) ("prudential standing inquiry requires a clear identification of the relevant provision that is the basis of the lawsuit").

In this case, there is no dispute that the Corps' decision to issue NWPs 21, 49 and 50 constitutes agency action within the meaning of the APA. Moreover, Plaintiffs have alleged injuries to their members' aesthetic and recreational interests in local streams and lakes due to water pollution from mining operations authorized by NWPs 21 and 50–injuries within the zone of interests sought to be protected by both the CWA and NEPA. (Docs. # 179-7; # 179-8; # 179-9). As stated above, the congressionally-expressed goal of the CWA "is to restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a). Specifically, § 404(e) deals only with general permits for discharges of dredged or fill material into navigable waters. *Id.* § 1344(e). Similarly, NEPA is designed to "promote efforts which will prevent or eliminate damage to the environment and biosphere and stimulate the health and welfare of man." 42 U.S.C. § 4321. Plaintiffs challenge specific provisions of CWA and NEPA dealing with cumulative impacts and argue that the Corps did not properly determine that the issuance of the NWPs would have minimal environmental effects. Plaintiffs' members specifically allege injuries caused by the environmental effects of the NWPs' authorized activities and therefore have satisfied the APA's additional standing requirements. Consequently, for the reasons stated herein, Plaintiffs KFTC and KWA have standing to challenge NWPs 21 and 50, but they lack standing to challenge NWP 49.

### C. Plaintiffs' Facial Challenge to NWP 21 is Not Moot

Defendants next contend that Plaintiffs' facial challenge to NWP 21 is moot because

the Corps has suspended NWP 21 in the Appalachian region and has never suggested that it will issue any NWP 21 authorizations before the permit expires in March 2012. Thus, defendants argue, the Court cannot award any relief that would make a difference to the legal rights of the Plaintiffs. The Court disagrees.

The expiration of a permit which forms the basis of a claim generally renders the claim moot. *Nat'l Parks Conservation Ass'n, Inc.*, *v. U.S. Army Corps of Eng'rs*, 574 F. Supp. 2d 1314, 1320 (S.D. Fla. 2008) (collecting cases). However, in the instant case, NWP 21 has merely been suspended; it was not revoked and will not expire until March 2012. Additionally, the activity that Plaintiffs seek to enjoin is still occurring, as prior authorizations remain effective and filling activities can continue under those authorizations until March 2013. *See* 75 Fed. Reg. 34711, at 34714. If the Court were to find that NWP 21 is facially invalid, the Court could vacate its use and enjoin any activities occurring in the Eastern District of Kentucky pursuant to the permit. Despite the parties' disagreement whether Plaintiffs have effectively plead both a facial and an as-applied challenge to the nationwide permits, the Court could still grant effective relief (i.e., enjoining any specific authorization activities) if it were to find that NWP 21 is facially invalid. Accordingly, Plaintiffs' facial challenge to NWP 21 is not moot.

**D.    The Corps' Decision to Issue NWPs 21 and 50 was neither Arbitrary nor Capricious under the APA, CWA and NEPA**

Plaintiffs allege that the Corps' decision to issue NWPs 21 and 50 was arbitrary and capricious in violation of the APA, CWA and NEPA. In their most recent Renewed Motion for Summary Judgment (Doc. # 179), Plaintiffs stated that they have significantly narrowed the focus of their allegations to two issues: cumulative impacts and compensatory

26

mitigation.  Moreover, Plaintiffs have withdrawn any other claims that are unrelated to these two issues.  (Doc. # 179-1, at 3).  A more thorough review of Plaintiffs' briefing reveals that Plaintiffs' remaining claim is that the Corps' cumulative impacts analysis was arbitrary and capricious in violation of both the CWA and NEPA, because the Corps (1) illegally excluded the effects of past NWP authorizations; and (2) improperly relied upon unsupported claims that compensatory mitigation is effective.  Although Plaintiffs do not separate their legal analysis with respect to the two different statutes, the CWA and NEPA each have a different set of regulations governing their application, and, therefore, the Court must analyze the Corps' decision separately under each statute.

Since the Plaintiffs' Motion to Lift the Stay and Reinstate the Parties' Cross-Motions for Summary Judgment (Doc. # 169), there has been an ongoing disagreement between the parties as to whether Plaintiffs' Supplemental Complaint (Doc. # 128) raises as-applied challenges, as opposed to merely facial challenges, to the 2007 NWPs 21 and 50. However, the Court finds that a lengthy discussion concerning that issue is unnecessary. While Plaintiffs continue to maintain that they have plead and are asserting as-applied challenges to the nationwide permits, they have only argued facial challenges in their briefing.  Plaintiffs have not identified any specific authorizations that they seek to challenge on an as-applied basis.  Indeed, such a challenge would require individual administrative records from the district engineers for each project authorized under the NWPs in order to determine whether the decision to authorize that particular project was arbitrary and capricious.  Therefore, through their briefing, Plaintiffs have effectively abandoned any as-applied challenges, and the Court will only address the facial challenges raised in their Renewed Motion for Summary Judgment (Doc. # 179).

To prevail on a facial challenge, the Plaintiffs "must establish that no set of circumstances exists under which the [permit] would be valid." *United States v. Salerno*, 481 U.S. 739, 745 (1987); *see also Reno v. Flores*, 507 U.S. 292, 300-01 (1993) (acknowledging that *Salerno* applies to a statutory challenge as well as a constitutional one). Plaintiffs argue that the Corps' cumulative impact analysis for NWP 21 consists, in its entirety, of the following perfunctory analysis:

> Using the current trend, approximately 1,085 activities could be authorized over a five year period until this NWP expires, resulting in impacts to approximately 320 acres of waters of the United States, including jurisdictional wetlands. Approximately 540 acres of compensatory mitigation would be required to offset those impacts. The required compensatory mitigation will attenuate cumulative impacts on the Nation's aquatic resources, so that the net effects on the aquatic environment resulting from the activities authorized by this NWP will be minimal.

(Doc. # 179-1, at 4) (citing NWP 21 Decision Document). Plaintiffs also contend that the Corps' cumulative impact analysis for NWP 50 is identical except for different acreage numbers:

> Using the current trend, approximately 430 activities could be authorized over a five year period until this NWP expires, resulting in impacts to approximately 150 acres of waters of the United States, including jurisdictional wetlands. Approximately 195 acres of compensatory mitigation would be required to offset those impacts. The required compensatory mitigation will attenuate cumulative impacts on the Nation's aquatic resources, so that the net effects on the aquatic environment resulting from the activities authorized by this NWP will be minimal.

*Id.* at 5 (citing NWP 50 Decision Document).

As an initial matter, the Court must address Plaintiffs' request that this Court adopt the recent decision of the Southern District of West Virginia in *Ohio Valley Envtl. Coal. v. Hurst*, 604 F. Supp. 2d 860 (S.D.W. Va. 2009), wherein the court found that the Corps' cumulative impact analysis for the 2007 version of NWP 21 was inadequate, for the very

same reasons that Plaintiffs now argue before this Court, and vacated the permit and enjoined its use in that district. As the Plaintiffs are well aware, that decision is not binding on this Court. Moreover, *Hurst* is easily distinguishable from the present case. Most significantly, in *Hurst*, the district court did not consider the Protocol that is used in the Eastern District of Kentucky to apply mitigation measures. Furthermore, it appears that the district court merely relied on the 2007 NWP 21 Decision Document to support its conclusion that the Corps' cumulative impact analysis was arbitrary and capricious rather than perform a thorough review of the entire administrative record. *See Hurst*, 604 F. Supp. 2d at 884, 887 ("The Corps' cumulative impacts analysis consisted primarily of the estimated number of times NWP 21 (2007) would be used on a national basis. ... The 'mere listing' of mitigation measures and processes, without any analysis, cannot support a cumulative impacts determination."). On the other hand, this Court has conducted an extensive review of the Protocol used in the Eastern District of Kentucky, see Section II. pp. 11-13, *supra*, and Section III. D. 1. ii, *infra*, and of the administrative record as whole, see Section III. D. 1., *infra*.

Consequently, the Court finds that Corps' decisions to issue NWPs 21 and 50 were neither arbitrary nor capricious as the Corps examined the relevant data and articulated a satisfactory explanation for its actions.

### 1.    The Corps' cumulative impact analysis under NEPA was not arbitrary and capricious

Under § 102 of NEPA, a federal agency, must prepare a detailed environmental impact statement (EIS) for "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C). However, an agency may prepare a less

intensive document–an EA– if the agency's proposed action is not categorically excluded from the requirement to produce an EIS or is one that would not normally require the production of an EIS.  40 C.F.R. § 1501.4(a) & (b).

An EA must "[b]riefly provide sufficient evidence and analysis for determining whether to prepare an environmental impact statement ... ."  *Id.* § 1508.9(a)(1).  Thus, an EA "[s]hall include brief discussions ... of the environmental impacts of the proposed action ... ."  *Id.* § 1508.9(b).  The regulations provide for three different environmental impacts[5]: direct, indirect and cumulative.  *See id.* §§ 1508.7-.8.  These impacts include, but are not limited to, ecological, aesthetic, historic, cultural, economic, social or health.  *Id.* § 1508.8.  Direct impacts "are caused by the action and occur at the same time and place."  *Id.* § 1508.8(a).  Indirect impacts "are caused by the action and are later in time or farther removed in distance, but are still reasonably foreseeable."  *Id.* § 1508.8(b).  Cumulative impacts are "the impact on the environment which results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions regardless of what agency (Federal or non-Federal) or person undertakes such other actions."  40 C.F.R. § 1508.7.  If no significant impacts are identified in the EA, an agency may finalize its decision after making a "finding of no significant impact" without having to prepare an EIS.  § 1501.4(e).

Pursuant to the APA, the Court reviews an agency's EA and decision not to issue an EIS under the deferential arbitrary and capricious standard outlined above.  *See* 5 U.S.C. § 706(2)(A).  To determine whether the agency acted arbitrarily and capriciously,

---

[5] "Effects" and "impacts" are synonymous as used in the CEQ's regulations under NEPA.  40 C.F.R. § 1508.8.

"[the Court] will not substitute [its] judgment of the environmental impact for the judgment of the agency, but [it] will insist that the agency has, in fact, adequately studied the issue and taken a hard look at the environmental consequences of its decision." *Save Our Cumberland Mountains v. Kempthorne*, 453 F.3d 334, 339 (6th Cir. 2006) (citing *Kelley v. Selin*, 42 F.3d 1501, 1518-19 (6th Cir. 1995)) (internal quotation marks omitted). The Court should keep in mind that "NEPA does not require agencies to adopt any particular internal decisionmaking structure." *Baltimore Gas & Elec. Co. v. Nat'l Res. Defense Council, Inc.*, 462 U.S. 87, 100 (1983). Because the Court finds that the Corps has taken the requisite "hard look" at the environmental consequences of its decision to issue NWPs 21 and 50, the Corps' did not act arbitrarily and capriciously in conducting its cumulative impact analysis and making a finding of no significant impacts.

### i. The Corps did not illegally exclude the present effects of past NWP authorizations

The Plaintiffs contend that the Corps did not conduct a valid cumulative impacts analysis under NEPA, because it only considered the foreseeable effects of newly authorized NWP activities from 2007 to 2012, the five years that NWPs 21 and 50 would be in effect. In doing so, the Plaintiffs allege that the Corps excluded the present effects during that same five-year period of all prior NWP authorizations. The Court disagrees.

Under NEPA, the Corps has an obligation to consider the present effects of past actions as part of its cumulative impacts analysis. *See* 40 C.F.R. § 1508.7. In a 2005 memorandum, the CEQ provided additional guidance on the disclosure of cumulative impacts under NEPA. (Doc. # 183-28)[6]. The CEQ explains that NEPA's environmental

---

[6] This document is available at http://ceq.hss.doe.gov/nepa/regs/Guidance_on_CE.pdf.

analysis is "forward-looking," meaning that it focuses on the potential impacts of the agency's proposed action. *Id.* at 1. Therefore, past actions are considered only to the extent that this consideration "informs agency decisionmaking regarding the proposed action." *Id.* Specifically, the CEQ memorandum provides:

> [T]he effects of past actions may warrant consideration in the analysis of the cumulative effects of a proposal for agency action. CEQ interprets NEPA and CEQ's NEPA regulations on cumulative effects as requiring analysis and a concise description of the identifiable present effects of past actions *to the extent that they are relevant and useful in analyzing whether the reasonably foreseeable effects of the agency proposal for action and its alternatives may have a continuing, additive and significant relationship to those effects.* ... [A]gencies have discretion to determine whether, and to what extent, information about the specific nature, design, or present effects of a past action is useful for the agency's analysis of the effects of a proposal for agency action and its reasonable alternatives. Agencies are not required to list or analyze the effects of individual past actions unless such information is necessary to describe the cumulative effect of all past actions combined. Agencies retain substantial discretion as to the extent of such inquiry and the appropriate level of explanation. ... Generally, agencies can conduct an adequate cumulative effects analysis by focusing on the current aggregate effects of past actions without delving into the historical details of individual past actions.

*Id.* at 1-2 (emphasis added).

In its final notice to reissue NWP 21 and issue new NWP 50, the Corps specifically referenced the CEQ memorandum and stated:

> Except for a few activities, the NWPs do not authorize activities of a continuing nature. In general, they authorize construction activities with specific start and end dates. The NWPs can be issued for only a period of five years or less, and once an NWP expires, it cannot be used to authorize activities in waters of the United States. An activity must then be authorized by the reissued NWP, another NWP, a regional permit, or an individual permit. The cumulative effects analysis is more properly focused on the permits that can be used to authorize regulated activities, not past permits that have expired. Therefore, the cumulative effects analysis for the NWP issuance needs to focus on the reasonably foreseeable cumulative effects

that are expected to occur during the five year period the NWPs are valid. We use information on past use of the NWPs to estimate how often an NWP will be used during the period it will be valid, and to estimate the impacts and compensatory mitigation resulting from the use of that NWP.

72 Fed. Reg. 11092, at 11096. Thus, the Corps concluded that the past activities authorized under the 2002 NWP 21 were not ongoing and have no continuing relationship to the activities authorized under the 2007 NWP 21. A review of the administrative record reveals that the Corps' decision not to directly consider the past activities authorized under the 2002 NWP 21 was not arbitrary and capricious. As discussed more thoroughly below, a main facet of the Corps' decision to issue NWPs 21 and 50 was compensatory mitigation. Despite any adverse environmental effects that may result from the authorized activities, the Corps required mitigation to offset these effects. The 2002 NWP 21 also required this same compensatory mitigation. Therefore, it was reasonable for the Corps to conclude that the activities authorized under the 2002 NWP 21 would not have any continuing adverse effects on the environment because the required compensatory mitigation would offset these effects. Indeed, based on a review of all 2002 NWP 21 authorizations in Eastern Kentucky, the Corps estimated that the authorized activities, after mitigation, would actually result in an increase to the functional capacity of the headwater streams affected, a total gain of 25,821 EIUs. (Doc. # 182-19, at 7). While acknowledging that the Corps did not provide a detailed explanation for its belief that the past activities authorized under the 2002 NWP 21 would not have a continuing effect on the environment, the Court may "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned." *Motor Vehicle Mfrs. Ass'n of the U.S., Inc.*, 463 U.S. at 43 (citations omitted). Because the Corps' path can reasonably be discerned here, its decision will be upheld.

Moreover, even though the Corps reasoned that the cumulative effects analysis was more properly focused on the activities to be authorized rather than past activities, it did not entirely dismiss any and all analysis of the present effects of past activities. First, the Corps used information on past use of the NWPs to estimate how often NWPs 21 and 50 would be used during the five-year period they are valid, the potential impacts resulting from their use, and the compensatory mitigation required to offset such effects. (Docs. # 179-3, at 21-22; 179-5, at 18). These estimates of the projected uses of NWPs 21 and 50, the acres impacted, and the amount of compensatory mitigation were all developed from data provided by the Corps' district offices and surveys, specifically from pre-construction notifications. 72 Fed. Reg. 11092, at 11096. Additionally, the Corps very own application process for NWPs 21 and 50 allowed for an indirect assessment of any present effects of past activities. The SMCRA required that each permit application "include a description of the existing, premining environmental resources within the proposed permit area and adjacent areas that may be affected or impacted by the proposed surface mining activities." 30 C.F.R. § 779.11. Thus, when the Corps reviewed the SMCRA applications, it was taking account of the present effects of past activities because it reviewed each site's existing condition. Likewise, the Corps own mitigation measures required that each applicant complete a functional assessment of the water quality at the proposed project site. Again, this requirement allowed the Corps to review the present effects of any past activities on each proposed project site prior to its authorization.

Plaintiffs also argue that the Corps' failure to consider the present effects of past activities during its NWPs 21 and 50 decision-making process is irrational because the

34

Corps took the opposite position and considered past effects when it prepared its October 2005 programmatic EIS on surface coal mining in Appalachia. The Plaintiffs point out that in that EIS, the Corps' cumulative impact analysis was based on ten years (1992-2002) of permit footprints and projected future stream losses through 2013. Plaintiffs' argument is unpersuasive.

First, the EIS that Plaintiffs refer to was prepared by several lead agencies (EPA, OSM, USFWS, DEP, and the Corps) pursuant to a settlement agreement entered in the case *Bragg v. Robertson*, Civ. No. 2:98-0636 (S.D. W. Va.). (Doc. # 179-6, at 2). The EIS specifically states that the settlement agreement "provided for the preparation of the EIS, *but the agencies did not concede that the EIS was required by [NEPA]*." *Id.* (emphasis added). Thus, since the Corps did not actually admit that a cumulative impacts analysis based on ten years of past activities was necessary to comply with NEPA, the Corps failure to do so here does not render its decision irrational. Furthermore, that same EIS later states: "The estimates of future stream loss are liberal, in that they do not take into account the focus on avoidance, minimization, and mitigation requirements in the 2002 NWP 21. Independent of any other future actions, the 2002 NWP 21 will likely *reduce* the rate of stream loss that occurred in the preceding ten-year time frame ... ." *Id.* at 8 (emphasis added). Therefore, the EIS actually supports the Corps decision not to fully consider the past activities in the issuance of the 2007 NWPs 21 and 50, because, as stated above, the 2002 NWP 21 required compensatory mitigation to offset any adverse environmental effects.

Finally, despite Plaintiffs' contention that the Corps' cumulative impacts analysis consisted primarily of the estimated number of times NWPs 21 and 50 would be used on a national basis, the Corps conducted a much more thorough cumulative impacts analysis. Plaintiffs merely focus on one paragraph in the respective Decision Documents (Docs. # 179-3, at 22; 179-5, at 18), but an extensive review of the entire Decision Documents in connection with the administrative record reveal that Corps' cumulative impact analysis did not simply consist of "a calculation of the number of expected NWP uses for the next five years."

Inherent in the NEPA cumulative impacts analysis was the Corps' comprehensive analysis of the 404(b)(1) Guidelines and the public interest review factors. Under the public interest review and the 404(b)(1) Guidelines analysis, the Corps considered the "expected impacts resulting from the use of [NWPs 21 and 50] as well as the reasonably foreseeable cumulative adverse effects that are expected to occur." (Docs. # 179-3, at 22; 179-5, at 18). Additionally, the Corps provided specific reasons why these impacts would not have more than a minimal cumulative effect on the environment.

For example, the Corps noted that adverse effects to the chemical composition of the aquatic environment will be minor because they will be controlled by General Condition 6, which states that the material used for construction must be free from toxic pollutants in toxic amounts. (Docs. # 179-3, at 23; 179-5, at 19). The Corps recognized that authorized projects may result in the destruction of wetlands, some permanently and some only temporarily. However the Corps also concluded that General Condition 20 (Mitigation), which requires avoidance and minimization of impacts to waters, and General Condition

19, which prohibits the use of NWPs 21 and 50 to discharge dredged or fill material in designated critical resource waters and adjacent wetlands, will ensure that the net adverse effects on the aquatic environment are minimal. The Corps additionally reviewed the effects that the activities may have on the habitat characteristics of streams and wetlands that may decrease the quality and quantity of fish and wildlife habitat. In addition to the PCN requirement and compensatory mitigation, the Corps found that General Condition 2 will reduce the adverse effects to fish and other aquatic species by prohibiting activities that substantially disrupt the necessary life cycle movements of indigenous aquatic species. Moreover, compliance with General Conditions 3 and 5 will ensure that the authorized work has minimal adverse effects on spawning areas and shellfish beds, and General Condition 4 will restrict effects on breeding areas for migratory birds. These are just a few examples from the Corps' thorough cumulative impacts analyses for NWPs 21 and 50.

Another fundamental part of the Corps' cumulative impacts analysis involved the PCN requirement for NWPs 21 and 50. The Corps reasoned that "[t]he pre-construction notification requirement allows district engineers to review proposed activities on a case-by-case basis to ensure that the adverse effects of those activities on the aquatic environment are minimal." (Doc. # 179-3, at 20). The Corps found that a district review was the most practicable because "the impacts to waters vary greatly depending on the mining techniques and the environmental factors in the area." *Id.* at 6. Moreover, unlike most NWPs, NWPs 21 and 50 also required specific authorization from the Corps before activities could commence. This pre-construction review allowed the district engineers to adequately examine each applicant's proposed project and, if necessary, exercise

discretionary authority if it was determined that the adverse effects would be more than minimal. The Corps' reliance on the district review was certainly reasonable as "[e]ach district tracks losses of waters of the United States authorized by Department of the Army permits, including verified NWPs, as well as compensatory mitigation achieved through aquatic resource restoration, creation, and enhancement." 72 Fed. Reg. 11092, at 11152.

As stated in its final notice to reissue NWP 21 and issue new NWP 50, the Corps specifically indicated that NWPs 21 and 50 are a "special case" because they "authorize activities for which review of environmental impacts, including impacts to aquatic resources, is separately required under ... [the] Surface Mining Control and Reclamation Act ... ." *Id.* at 11094. Thus, the Corps found that it would be duplicative to require the same analyses through the individual permitting process. *Id.* However, through the pre-construction notification requirement, the district engineers would be able to review the analyses prepared for the SMCRA permit and, if necessary, exercise discretionary authority to require an individual permit for activities that would have more than minimal adverse effects. *Id.* While the SMCRA's requirements do not absolve the Corps from conducting a cumulative impacts analysis, the additional environmental review required by the SMCRA certainly supports the Corps' decision that the issuance of NWPs 21 and 50 would have minimal cumulative effects.

NEPA requires that the EA briefly provide sufficient evidence and analysis for determining whether to prepare an EIS and include a brief discussion of the environmental impacts of the proposed action. 40 C.F.R. § 1508.9(a) & (b). As outlined above, the Corps met these requirements for NWPs 21 and 50. The Corps considered the foreseeable

environmental effects that could result from mining activities. The Corps explained that the NWPs' General Conditions, including compensatory mitigation, would ensure that the cumulative effects would be minimal. The Corps considered the past use of the 2002 NWP 21 to predict the number of times the 2007 NWPs 21 and 50 would be used on a national basis, how many acres would be affected, and how many of acres of mitigation would be required. Moreover, the Corps' conclusion that the activities authorized under the 2002 NWP 21 would not have any continuing adverse effects on the environment because the required compensatory mitigation would offset these effects was not irrational. Consequently, the Corps cumulative impacts analysis was not arbitrary and capricious as it involved a thorough review of the environmental effects resulting from the issuance of NWPs 21 and 50 and was therefore NEPA-compliant. *See Robertson*, 490 U.S. at 350 ("If the adverse environmental effects of the proposed action are adequately identified and evaluated, the agency is not constrained by NEPA from deciding that other values outweigh the environmental costs.").

### ii.     The Corps did not improperly rely on compensatory mitigation

Plaintiffs also assert that the Corps' cumulative impacts analysis for NWPs 21 and 50 was arbitrary and capricious because it was conclusory and relied on unsupported claims that compensatory mitigation is effective. Plaintiffs argue that the Corps provided no supporting explanation or documentation to support its determination that "[t]he required compensatory mitigation will attenuate cumulative impacts on the Nation's aquatic resources, so that the net effects on the aquatic environment resulting from the activities authorized by [NWPs 21 and 50] will be minimal." (Docs. # 179-3, at 22; 179-5, at 18).

Several circuits have held that reliance on mitigation measures may reduce a project's impacts below the level of significance, warranting a FONSI. *See e.g., Ohio Valley Envt'l Coal. v. Aracoma Coal Co.*, 556 F.3d 177, 191-92 (4th Cir. 2009) (citation omitted); *Spiller v. White*, 352 F.3d 235, 239 (5th Cir. 2003); *Tillamook Cnty. v. U.S. Army Corps of Eng'rs*, 288 F.3d 1140, 1144 (9th Cir. 2002); *Audubon Soc'y of Cent. Ark. v. Dailey*, 977 F.2d 428, 435-36 (8th Cir. 1992); *C.A.R.E. Now, Inc., v. Fed. Aviation Admin.*, 844 F.2d 1569, 1575 (11th Cir. 1988); *Cabinet Mountains Wilderness/Scotchman's Peak Grizzly Bears  v. Peterson*, 685 F.2d 678, 682 (D.C. Cir. 1982).  Moreover, the Supreme Court has held that a proposed mitigation plan does not need to be laid out to the finest detail in an EA or EIS to be NEPA-compliant.  *Robertson*, 490 U.S. at 352 ("There is a fundamental distinction ... between a requirement that mitigation be discussed in sufficient detail to ensure that environmental consequences have been fairly evaluated ... and a substantive requirement that a complete mitigation plan be actually formulated and adopted ... .").  Indeed the Sixth Circuit recognized that "it would be inconsistent with NEPA's reliance on procedural mechanisms- as opposed to substantive, result-based standards- to demand the presence of a fully developed plan that will mitigate environmental harm before an agency can act."  *Communities, Inc. v. Busey*, 956 F.2d 619, 626 (6th Cir. 1992) (quoting *Robertson*, 490 U.S. at 353).  Moreover, other Circuits have held that prospective mitigation plans satisfy NEPA's requirements so long as the plans were "developed to a reasonable degree."  *Wetlands Action Network v. U.S. Army Corps of Eng'rs*, 222 F.3d 1110, 1121 (9th Cir. 2000), *abrogated on other grounds by Wilderness Soc. v. U.S. Forest Serv.*, 630 F.3d 1173 (9th Cir. 2011); *see also Mason Cnty. Med. Ass'n v. Knebel*, 563 F.2d 256, 264-65 (6th Cir. 1977) (citations omitted) (NEPA hard look requirement is tempered

by a practical rule of reason; impact statement need not document every particle of knowledge an agency might compile in assessing a project.).

Again, Plaintiffs' argument that the Corps' reliance on compensatory mitigation was arbitrary and capricious is based solely on one paragraph in the NWPs' respective decision documents.  However, the Corps' cumulative impacts analysis and reliance on compensatory mitigation encompasses much more than just that one paragraph.  When the Corps made its decision to re-issue NWP 21 and issue new NWP 50, it specifically contemplated the use of new functional assessment protocols to implicate regional mitigation plans: "[The Corps is] currently developing new stream functional assessment protocols to identify and quantify the functions lost through authorized impacts and the functions gained or enhanced through mitigation."  (Docs. # 179-3, at 9; 183-5, at 8).  Moreover, NWP 21's Supplemental Decision Document for the Louisville District specifically identified the Eastern Kentucky Stream Assessment Protocol and stated that this protocol "takes specific conductivity, RBP, macroinvertebrate data, and stream flow into account in determining suitable mitigation to achieve minimal impact."  (Doc. # 182-4, at 2).

Furthermore, a review of the entire administrative record, which contained the June 4, 2002 version of the Protocol, reveals that the Protocol was developed to a reasonable degree and based on scientific data.  Indeed, in its Mitigation Guidelines, the Corps stated that its mitigation plan was developed in response to the 2001 National Research Council/National Academy of Sciences Study, *Compensating for Wetland Losses Under the Clean Water Act*, and focused on "taking a watershed approach to mitigation, requiring wetland and stream mitigation in the context of the watershed's ecological needs, and ensuring protection of wetland and other aquatic areas established as mitigation."  (Doc.

# 182-10, at 4).

The administrative record included several scientific articles and studies that the Corps relied upon and/or incorporated into the Protocol. Just a few examples include the EPA's Rapid Bioassessment Protocol (RBP), a Stream Restoration Handbook prepared by the North Carolina Stream Restoration Institute and North Carolina Sea Grant, and a report from the Kentucky Department for Environmental Protection-Division of Water, entitled *Methods for Assessing Biological Integrity of Surface Waters.* Moreover, the record contained actual data collected by the Kentucky Division of Water from several sites in the Eastern Coalfield Region. Finally, the record included a number of Microsoft PowerPoint presentations specifically detailing the aspects of the Protocol and how to implement these mitigation measures in the Eastern District of Kentucky.

All existing NWPs are subject to a number of general conditions. General Condition 20 (Mitigation) provides that compensatory mitigation is required for permanent losses of waters of the United States, or for permanent adverse effects to aquatic resource functions. 72 Fed. Reg. 11092, at 11163. Thus, as a condition precedent to obtaining an authorization under NWPs 21 or 50, an applicant must comply with General Condition 20 and propose a very detailed compensatory mitigation plan prior to authorization. *See* (Doc. # 182-10, Mitigation Guidelines). "Compensatory mitigation requirements will be determined by district engineers on a case-by-case basis, after considering relevant and available information, such as the ecological conditions of the project site, the type of activity, the impacts of the activity on the aquatic environment and other public interest factors, and the type of aquatic resources that will be adversely affected by the NWP activity." *Id.* at 11164. As stated above, in the Eastern District of Kentucky, this case-by-

case basis utilizes the Protocol.

The Protocol assesses the environmental quality of a particular headwater stream ecosystem based on data reflecting its physical, chemical and biological characteristics. (Doc. # 183-7, at ¶ 10). This data serves as an indicator of the headwater stream's capacity to perform aquatic functions and is scored on a scale–known as the Ecological Integrity Index (EII)–from 0.1 to 1.0, with 1.0 representing streams with the highest environmental quality. *Id.* Then, the EII score is multiplied by the length of the proposed impact to get an estimate of the functional capacity known as Ecological Integrity Units (EIUs). *Id.* The EIUs represent both the quality and quantity of a particular site. *Id.*

The Protocol first requires a site characterization and description of the stream (e.g., origin and type) and the landscape. (Doc. # 183-7, at ¶ 14). This includes a summary of the riparian vegetation features and measurements of in-stream parameters such as width, depth, flow and substrate. *Id.* Additionally, the characterization phase requires a screening for "red flag" issues, such as endangered species or cultural resources. *Id.*

The next step involves a site assessment of two broad components–the biotic (living, biological constituents) component and the abiotic (non-living, physical and chemical constituents) component. *Id.* at ¶ 15. The biotic component measures five biological characteristics, based on the Macroinvertebrate Bioassessment Index (MBI), a study done by members of the KDOW, that were indicative of water quality. *Id.* at ¶¶ 16-18. The abiotic component assesses the stream's ability to conduct an electrical current. *Id.* at ¶ 20. Several studies have found that sites with greater conductivity level are less likely to be able to support and maintain biological communities. *Id.* at ¶ 21. The abiotic component also assesses the physical integrity of a site in accordance with the Rapid

Bioassessment Protocol (RBP) developed by the EPA. *Id.* at ¶ 22. This includes an assessment of ten parameters pertinent to habitat quality. *Id.* at ¶ 23. These three (biological, chemical and physical) subindices are then averaged together to calculate the EII, which is then multiplied by the number of linear feet representing the stream condition, yielding the EIUs. *Id.* at ¶¶ 25, 28.

The final step is a mitigation analysis that uses the calculated EIUs to quantify the potential impact to a particular site and the compensatory mitigation needed to offset the unavoidable impacts to the aquatic environment. *Id.* at ¶ 29. Thus, if a proposed project would result in a loss of 1,000 EIUs, a mitigation plan resulting in a gain of at least 1,000 EIUs would be required. *Id.* The mitigation analysis also analyzes other factors, such as the time needed for full replacement of aquatic functions and the likelihood of success of the mitigation measures. *Id.* at ¶ 30. If the Corps determines that the project has avoided and minimized potential impacts to the aquatic environment and that on-site and off-site compensatory mitigation is not practicable, as a last resort, the Corps may authorize the permittee to pay an ILF fund. *Id.* at ¶ 33. This fund is managed by the Kentucky Department of Fish and Wildlife Resources (KDFWR) and contributes to mitigation projects that are meant to offset the impacts that generated the ILF. *Id.*

Clearly, the Protocol was developed to a reasonable degree to be NEPA-compliant. The Protocol gave environmental impacts a numerical value (in EIUs) by assessing the quality and quantity of the particular headwater stream affected. Additionally, the Protocol requires that the permittee offset the EIUs of impact with an equal or greater number of EIUs of mitigation, resulting in no net loss of EIUs. Thus, the Corps determined that the mitigation measures would result in minimal cumulative impacts. Furthermore, the Corps

44

assigned additional requirements for mitigation measures:

> In order to ensure that an activity results in no more than minimal adverse effect on the aquatic environment, the Corps will add permit conditions that require compensatory mitigation that meets specified success criteria. The Corps will generally require the permittee to monitor the mitigation site for five years and, if the mitigation site does not meet the success criteria at that time, remediation or additional mitigation will be required. This ensures that the authorized activity will not result in a net loss in aquatic functions.

72 Fed. Reg. 11092, at 11115. The novelty of a mitigation measure or the fact that there may be some uncertainty as to the success of mitigation does not make reliance on the mitigation measure irrational. *See Aracoma Coal Co.*, 556 F.3d at 205 (citations omitted) ("When an agency is called upon to make complex predictions within its area of special expertise, a reviewing court must be at its most deferential.") Moreover, the monitoring requirement allows the Corps to reevaluate the mitigation measures as the projects progress. *See id.* For all of these reasons, the Corps' reliance on mitigation measures was not arbitrary and capricious.

## 2. The Corps' cumulative impact analysis under CWA was not arbitrary and capricious

The CWA provides that the Corps may "issue general permits ... for any category of activities involving discharges of dredged or fill material if the [Corps] determines that the activities in such category are similar in nature, will cause only minimal adverse environmental effects when performed separately, and will have only minimal cumulative adverse effect on the environment." 33 U.S.C. § 1344(e)(1). Besides the criteria provided in the 404(b)(1) Guidelines, there is no statutory requirement mandating how the Corps' cumulative impacts analysis is to be performed.

The Guidelines define cumulative impacts as "the changes in an aquatic ecosystem that are attributable to the collective effect of a number of individual discharges of dredged or fill material. "Although the impact of a particular discharge may constitute a minor change in itself, the cumulative effect of numerous such piecemeal changes can result in a major impairment of the water resources and interfere with the productivity and water quality of existing aquatic ecosystems." 40 C.F.R. § 230.11(g)(1). Cumulative effects "should be predicted to the extent reasonable and practical." *Id.* § 230.11(g)(2). The Corps is required to collect and solicit information from other sources concerning the cumulative effects on the aquatic ecosystem. *Id.* This information must be documented and considered during the evaluation process regarding the issuance of any NWP. *Id.* To predict cumulative effects, the evaluation must include the estimated number of individual discharge activities likely to be regulated under the General permit until its expiration, including repetitions of individual discharge activities at a single location. *Id.* § 230.7(b)(3).

### i. The Corps did not illegally exclude the present effects of past NWP authorizations

Plaintiffs assert that the Corps did not conduct a valid cumulative impacts analysis under the CWA, because it only considered the effects of newly authorized NWP activities from 2007 to 2012, the five years that the permit would be in effect. In doing so, the Plaintiffs allege that the Corps excluded the present effects during that same five-year period of all prior NWP authorizations. The Plaintiffs argument is misplaced.

As stated above, the § 404(b)(1) Guidelines define cumulative impacts as "the changes in an aquatic ecosystem that are attributable to the collective effect of a number of individual discharges of dredged or fill material." 40 C.F.R. § 230.11(g)(1). The

Guidelines also instruct that in order to predict cumulative effects, "the evaluation shall include the number of individual discharge activities likely to be regulated *under a General permit* until its expiration, including repetitions of individual discharge activities at a single location." *Id.* § 230.7(b)(3) (emphasis added). On its face, the Guidelines do not appear to require a review of the present effects of past activities for a cumulative impacts analysis.

Furthermore, the CWA definition of cumulative impacts is easily distinguishable from the NEPA definition of cumulative impacts. *Compare* 40 C.F.R. § 1508.7 ("Cumulative impact is the impact on the environment which results from the incremental impact of the action when added to *other past, present, and reasonably foreseeable future actions regardless of what agency (Federal or non-Federal) or person undertakes such other actions.*") (emphasis added). Most notable is that the CWA definition makes no mention of past activities. *See id.* § 230.11(g)(1). Therefore, the CWA cumulative impacts analysis only calls for consideration of impacts from individual discharges authorized by the particular permit at issue. Accordingly, the Court concludes that the Corps could not have violated the CWA by excluding the present effects of past NWP authorizations. For the reasons discussed *supra*, Section III. D. 1. i., the Corps conducted a thorough cumulative impacts analysis, and its decision that the issuance of NWPs 21 and 50 would have only minimal cumulative effects was not arbitrary and capricious.

One final matter deserves brief comment. Plaintiffs also contend that when the Corps suspended the use of NWP 21 in the Appalachian region, it admitted that the use of NWP 21 has resulted in adverse environmental impacts that may be more than minimal on a cumulative basis. *See* 74 Fed. Reg. 34311, at 34313. Thus, Plaintiffs allege that, based on this admission, "the Corps could not logically have made the required

47

determination under § 404(e) of the CWA at the time NWP 21 was reissued in 2007 that NWP 21 has [sic] had or will have, minimal environmental effects, both individually and cumulatively." (Doc. # 179-1, at 3). Plaintiffs' argument is unpersuasive. The CWA's 404(b)(1) Guidelines provide that cumulative effects "should be predicted to the extent reasonable and practical." 40 C.F.R. § 230.11(g)(2). Clearly, the EPA recognized that environmental effects cannot be predicted to any degree of certainty. As the Fourth Circuit stated, "[i]t is simply not the case that issuance of a general permit functions as a guarantee *ab initio* that every instance of the permitted activity will have only a minimal impact." *Ohio Valley Envtl. Coal. v. Bulen*, 429 F.3d 493, 500 (4th Cir. 2005). Therefore, the simple fact that the Corps has now acknowledged that the use of NWP 21 in the Appalachian region may result in more than minimal cumulative environmental effects does not support the Plaintiffs' contention that their CWA cumulative effects analysis was arbitrary and capricious.

### ii. The Corps did not improperly rely on compensatory mitigation

Plaintiffs also contend that the Corps' cumulative impacts analysis for NWPs 21 and 50 was arbitrary and capricious because it was conclusory and relied on unsupported claims that compensatory mitigation is effective. Plaintiffs argue that the Corps provided no supporting explanation or documentation to support its determination that "[t]he required compensatory mitigation will attenuate cumulative impacts on the Nation's aquatic resources, so that the net effects on the aquatic environment resulting from the activities authorized by [NWPs 21 and 50] will be minimal." (Docs. # 179-3, at 22; 179-5, at 18).

The Sixth Circuit has recognized that several other circuits have held that it is not necessary to have a final, detailed mitigation plan prior to the issuance of a § 404 permit. *Sierra Club v. Slater*, 120 F.3d 623, 636 (6th Cir. 1997) (citing cases). A permit conditioned on the future implementation of a mitigation plan complies with the requirements of the CWA. *Id.* As the Fourth Circuit held, a post-issuance, case-by-case impact analysis can satisfy the CWA's pre-issuance requirement of a finding of minimal impact. *Bulen*, 429 F.3d at 502 ("[S]ection 404(e) does not unambiguously forbid the Corps from making the minimal-environmental-impact determinations by relying in part on the availability of post-issuance procedures, and such reliance is a reasonable way for the Corps to ensure that the projects it authorizes under general permits will have only minimal impacts.").

As stated above, when the Corps made its decision to re-issue NWP 21 and issue new NWP 50, it specifically contemplated the use of protocols to implicate regional mitigation plans: "[The Corps is] currently developing new stream functional assessment protocols to identify and quantify the functions lost through authorized impacts and the functions gained or enhanced through mitigation." (Docs. # 179-3, at 9; 183-5, at 8). Moreover, NWP 21's Supplemental Decision Document for the Louisville District specifically identified the Eastern Kentucky Stream Assessment Protocol and stated that this protocol "takes specific conductivity, RBP, macroinvertebrate data, and stream flow into account in determining suitable mitigation to achieve minimal impact." (Doc. # 182-4, at 2). Furthermore, a review of the entire administrative record reveals that the Protocol was developed to a reasonable degree and based on sufficient scientific data. Consequently, for the reasons stated in Section III. D. 1. ii., *supra*, the Corps' reliance on mitigation

measures was not arbitrary and capricious.

## IV.   CONCLUSION

Accordingly, for the reasons stated herein, **IT IS ORDERED** that:

(1)    Plaintiff Kentucky Riverkeeper, Inc. is hereby **DISMISSED** as a party for lack

of standing;

(2)    Plaintiffs' Kentuckians for the Commonwealth, Inc. and Kentucky Waterways

Alliance, Inc. claims regarding NWP 49 are hereby **DISMISSED** for lack of

standing;

(3)    Plaintiffs' Renewed Motion for Summary Judgment (Doc. # 179) is hereby

**DENIED**; and

(4)    Defendants' Renewed Cross-Motion for Summary Judgment (Doc. # 183)

and Intervenors' Cross-Motion for Summary Judgment (Doc. # 181) are

hereby **GRANTED**.

This 14th day of July, 2011.



Signed By:

*David L. Bunning*

**United States District Judge**